PAULSON, Plaintiff in error, vs. THE STATE, Defendant in error.

*April 23—May 8, 1903.*

*Criminal law: Murder: Corpus delicti: Evidence: Impeaching testimony: Appeal: Material error: Argument of counsel: Alibi.*

1. On a prosecution for the murder of a sixteen-year-old girl it appeared, among other things, that she had been left alone in a farm house, and during the absence of the other members of the family the house was burned. There was evidence tending in some measure to prove that a robbery had occurred in the house. By way of identification it appeared that after the fire the trunk of a human body was found lying in the cellar, upon what appeared to be the coals of a prepared pile of cord-wood,

carried into the cellar after the departure of the other members of the family. The trunk, consisting of the head, spinal column and pelvic bones, was of such size as to be consistent. with the description of the missing girl, and the teeth in the skull were similar in appearance with her teeth. *Held*, that the evidence presented a state of facts to the jury, from which they might be satisfied with the necessary certainty that the body found was that of the girl, and that her death had occurred by criminal means.

2. In criminal prosecutions, evidence against the accused should be confined to the very offense charged, and neither general bad character, nor commission of other specific disconnected acts, whether criminal or merely meretricious, can be proved against him, except where so connected with the offense charged that their commission directly tends to prove some element of alleged offense.

3. On a prosecution for murder, it is palpable and gross error to permit evidence that some three years before the alleged crime the accused had been convicted of larceny, or in permitting any other derogatory facts to be proved against him in any way.

4. On a prosecution for murder, in connection with which robbery was committed, one of the circumstances relied upon by the state was the fact that the accused had money after the crime, when he had not had any before, and there was evidence that he had stated that he had obtained the money by theft of wheat prior to the murder. *Held*, that such evidence did not warrant admission of evidence as to the commission of such theft by accused. The fact of guilt or conviction was not a proper one to be proved, even on the accused's own admission, standing alone. It could only be admissible, if at all, because it was part of a statement relating to other and relevant facts.

5. In such case, the best and only proper evidence being the records, it was error to allow parol proof of the various court proceedings.

6. In such case, admitting such parol evidence, even for the purpose of impeachment, is error. Parol proof of a prior conviction can be made only by virtue of sec. 4073, Stats. 1898 (providing that a person who has been convicted of a criminal offense is, notwithstanding, a competent witness; but the conviction may be proved to affect his credibility, either by the record, or by his own cross-examination), and then only by cross-examination.

7. To warrant an appellate court in deeming an error innocuous, it should appear beyond a doubt that the error complained of

did not and could not have prejudiced the rights of the party duly objecting.

8. Where, in a criminal trial, error was committed in proving by parol evidence, and as part of the state's case, prior convictions of accused for criminal offenses, such error is not cured or waived by the fact that accused afterwards takes the stand as a witness, and thereby opens the door to proof of a prior conviction, by way of impeachment.

9. On a prosecution for murder, one of the circumstances relied upon by the state was the fact that the accused had money after the crime had been committed, and the state drew out a portion of a conversation, which was made the basis of an argument, that the money which the accused was shown to have was the same stolen at the time the murder was ·committed. *Held*, that it was error to exclude proof, offered by the accused, of other parts of that conversation, and that such error was prejudicial.

10. On a prosecution for murder, the district attorney, in his opening to the jury, and before the taking of any evidence, stated, as a fact, that the accused, on the day before the event, was seen so close to the house, and under such circumstances, as to arouse suspicion of bad purpose—detailing such circumstances—of which facts not the slightest shred of evidence appeared throughout the case. *Held*, that such statements were extremely improper in the absence of a well-founded belief on the part of the district attorney that he could show such facts.

11. On a prosecution for murder, where it appeared that the body of deceased was consumed after the killing by the burning of the house in which the crime was alleged to have been committed, it is not error to admit in evidence photographs showing the ruins and the surrounding premises, after testimony had been given showing them to be correct representations of the scenes attempted to be portrayed.

12. In such case, it is not error to admit in evidence a partially burned block of wood taken from the pile of charcoal on which the body was found.

13. On a prosecution for murder, a witness testified, in effect, that he was of the opinion that accused was the same person seen by him at a certain place the night of the crime. The language of the witness as to reaching a belief of the identity of the two from information derived from others might well have been construed as applying to a conclusion reached by him before seeing the defendant, and was not inconsistent with the view that the testimony to his identity was based upon memory of the person seen by the witness, and observation of de-

fendant in court. *Held*, that the refusal of the trial court to strike out such testimony should be sustained on appeal.

14. On a prosecution for murder, evidence as to the conduct of the accused during the period of his flight from arrest, covering his conduct, numerous declarations shown not to be true, the use of assumed names, his places of residence, the use of money, carrying fire arms, and the like, is admissible as bearing on the probability of his guilt.

15. On a prosecution for murder for the purpose of a robbery, which was then and there committed, the accused, on cross-examination, was asked if he had stated that he knew a place where he could get some money, and, if there was anybody in the house, it would be easy to hit him on the head, and nobody would ever find it out, which he denied, and the state was allowed to introduce in rebuttal proof of such conversation. *Held*, that, in the absence of a request for an instruction that such evidence on behalf of the state could be considered only for the purpose of impeachment, the admission of such evidence is not error.

16. On a prosecution for murder, accused, in attempting to prove an *alibi*, testified to a trip taken by him on the night before the day of the crime, and described a locomotive on which he claimed he rode. *Held*, that a witness, who testified that he had been a brakeman on such railroad, and that he knew the only type of locomotives used on that road, was qualified to state that the locomotives used by the railroad company did not correspond with that described by the defendant as mounted and ridden by him on the night in question.

ERROR to review a judgment of the circuit court for Buffalo county: E. W. HELMS, Circuit Judge. *Reversed.*

Writ of error to conviction and sentence of the plaintiff in error, hereinafter called the "defendant," of murder in the first degree, for the murder of one Mary Seldon at the town of Pepin on June 16, 1898. The general course of events, as claimed by the prosecution, was substantially as follows:

On the date named, Thomas Seldon, a farmer, residing about two miles from Pepin, left home to attend a veterans' reunion at Pepin, together with all his family except his sixteen-year old daughter Mary, who was left in charge of the house, at from 9:30 to 10:30 in the forenoon. He left approximately $400 in a locked secretary in said house, con-

taining, amongst other things, thirteen $20 gold pieces and one $10 gold piece, the remainder being mainly in paper, with some silver. The daughter, Mary, was a quiet, homestaying girl of cheerful disposition, and exhibiting nothing abnormal in her disposition. Somewhere about 1 o'clock the house was discovered to be on fire by a passing farmer, who entered the premises, saw no one, made some entirely futile attempts at checking the fire, and then devoted himself to setting at liberty certain animals, and saving a buggy, and perhaps other property, from the sheds; he not being able to enter the house by reason of its being locked and by reason of the extent of the conflagration. An hour or two later, when the destruction was practically complete, Mr. Seldon, and about the same time some others, arrived on the ground, and about this time was discovered the trunk of a human body lying in the cellar of the one-story kitchen, upon what appeared to be the coals of a prepared pile of firewood, entirely distinct from the debris of the burned building, and of magnitude about six or eight feet square and some eighteen inches deep. A careful search in the ashes under the place where the secretary had stood resulted in the finding of no coins except two nickel pieces and a two-shilling pocket piece; also the lock of the secretary. There is no evidence of any one's being known to enter the premises after Seldon's departure until the discovery of the fire, except a son, who testifies that he came from another farm, put up his horses, got something to eat, and then himself went to Pepin to attend the reunion, perhaps an hour later than the others. The defendant resided with his father some five or six miles in another direction from the village of Pepin, and was not shown to have any recent knowledge of the Seldon premises. It was proved that he declared, a day or two before the 16th, that he was without money. It appeared that certainly on the morning of the 17th he was in St. Paul and Minneapolis, and made certain purchases, and expended money to the amount of $20 or $25. Upon inquiry

he claimed to have started for St. Paul during the night of the 15th, and, by stealing rides, to have arrived in St. Paul about noon of the 16th. Evidence was offered, in contradiction of this, that he was seen at Stockholm, on the Wisconsin side of Lake Pepin, and again in Lake City, on the Minnesota side, in the evening of June 16th, and that a boat was taken from the shore at Stockholm the evening of the 16th, and found on the shore at Lake City the following day. The identification of the defendant as the person so seen was a subject of dispute. He was arrested on June 20th, and in the August following made his escape from the county jail, after being informed that there was a threat of lynching. After some days of hiding, during which he visited his father's house, he fled to North Dakota, where he adopted an assumed name, and, after some farm work, spent the winter in a shanty in a remote region, hunting and trapping. Evidence was offered of the expenditure by him of considerable sums of money, including some six or seven $20 gold pieces. Other facts material to specific errors appear in the course of the opinion.

*S. G. Gilman,* for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General* and *Walter D. Corrigan,* second assistant attorney general, and oral argument by *Mr. Corrigan.*

DODGE, J. 1. The first branch of the contention of plaintiff in error is that the evidence was not sufficient to establish beyond a reasonable doubt either of the three elements of the alleged crime—the *corpus delicti,* the identity of the body, nor defendant's commission of the crime. It is neither necessary nor seemly for us to express the conclusions which, as individuals, we might have reached from a consideration of all this evidence. It is immaterial whether any member of the court might or might not have been convinced beyond a reasonable doubt of all or any of these elements of the crime

charged.  The question is whether the jury, as reasonable men, might have been so convinced; and in approaching that question it must be recognized that they had the right to believe one witness and equally to disbelieve another completely, or to accept as true and correct part of the testimony of any witness and to reject other parts; to weigh the interest and animus of each, and in so doing to be affected and guided by the appearance of each witness and his manner of testifying. In the light of these rules and considerations, we proceed to examine the evidence.

We have before use the facts that, a few hours before, a sixteen-year-old girl was left in this farmhouse with every probability, from her character and habits, that she would be found there alive on the return of her parents later in the day; that a body was found after the destruction of that house by fire, under circumstances which might warrant the inference that, at the expense of much exertion, a considerable quantity of cordwood had been carried into the cellar, and the body placed upon it after life was extinct.  Supplementing these was the circumstance, which evidence tended in some measure to prove, that a robbery had occurred in the house.  By way of identification it was testified that the bones which remained, consisting of the head, spinal column, and the pelvic bones, were of such size as to be consistent with the description of this sixteen-year-old girl; and one witness, who knew her intimately, testified to similarity in appearance of the teeth to those of Mary Seldon, which were described as peculiar.  True, in many of these respects doubt might well arise as to the ability of a witness to testify with any certainty to such facts, but those doubts were within the province of the jury, and bore not upon the competency of the evidence, but upon its weight.  Hence there was evidence of the existence of a dead body, of its identity as that of Mary Seldon, who was alive a few hours before, and there were facts and circumstances from which might well have been

drawn inference of sudden and unusual death, with other
facts and circumstances warranting inference against suicide
or accident.    Under the rules of law with reference to the
character and *quantum* of proof necessary to establish the
*corpus delicti* and identity, as declared in *Buel v. State,* 104
Wis. 132, 80 N. W. 78, we are forced to the conviction that
the field was open to the jury, without outrage upon reason,.
to be satisfied with the necessary certainty that the body found
was that of Mary Seldon, and that her death had occurred by
criminal means.

The more salient evidence bearing upon the connection of
the defendant with such crime has already been related in
the statement of facts.    The presence in this house of money
to serve as a motive, although there is little or no evidence
that the defendant knew of it; the almost complete desertion
of this and neighboring farm houses by reason of the gather-
ing in Pepin; the disappearance of the money—all of which
the jury might within reason have believed from the evi-
dence—present opportunity and motive for one living in the
neighborhood.    The fact, if the jury concluded it so to be,
that defendant a day or two before had no money, and on
the following day had money, is significant.    The further
fact, in this immediate connection, that after an incarceration
of a few months, and his escape from jail to the Dakotas, he
was in possession of money in considerable amounts, includ-
ing gold coins such as disappeared from this house, which, it
must be confessed, are not the customary form of daily ex-
change, is also a circumstance entitled to weight.    The de-
fendant, at great length, detailed the course of his transac-
tions and the extent of the work done and moneys earned dur-
ing that period, and that evidence was subject to analysis and
credit or discredit, according to probabilities, by the jury,
and, in our opinion, might, at their hands, have received such
construction and such belief as to constitute to their minds a
false story built up for the purpose of accounting for the

possession of this amount of money and of these gold pieces, and therefore in itself an evidence of guilt. During this same period the conduct of the accused was covered in minute detail by the production of witnesses at almost every stage of the events, indicating an industry and intelligence of research on the part of the prosecution most commendable. It took a wide range, covering the use of assumed names, of various statements made by accused as to his prior history, his place of residence, his possession of money and the source thereof, and of peculiar precautions in the giving of addresses for the receipt of mail and the like; many of which might have been deemed by the jury significant of a consciousness of guilt and desire to elude pursuit. Of course, those triors of fact might have deemed the fact established that defendant was in terror of lynching, and that these precautions were referable thereto, rather than to any sense of guilt; but equally they might not have so believed, and the weight of such circumstances as proof of defendant's guilt of the crime charged was, therefore, in their hands; and with their conclusion, confirmed by the opinion of the trial judge, indicated by his overruling of motions for new trial and in arrest of judgment, it is not the province of an appellate court to interfere. Again, the very attempt to establish an *alibi* on June 16th, if the story were a fabrication, as the jury might have believed, might have been deemed significant of guilt, especially in connection with the furtive method of the actual trip on the evening of June 16th, if the jury believed in the identification of defendant at Stockholm and Lake City. Without further discussion of the evidence, but after carefully considering all of it, we find ourselves unable to say that the jury might not, as reasonable men, have reached conclusions adverse to defendant's innocence upon each and all of the elements of the crime charged, beyond reasonable doubt; and we should not feel bound or justified in denying final effect to their decision on that question of fact, if satisfied that it has been

reached without the influence of improper evidence and under correct rules of law.

2. Several assignments of error are predicated upon the introducing in evidence, over objection and exception, of certain items of defendant's history in no wise connected with the crime charged, but tending to vilify or degrade him in the minds of the jury; especially that some three years before he had been guilty of stealing a quantity of rye from a farmer in Minnesota; that at first, on preliminary examination, he pleaded guilty, but later, when arraigned for trial, he changed front, and denied guilt; that after commitment by the justice he was confined in jail; that he was tried upon an indictment the contents of which were testified to orally; that four witnesses, whose names were given, testified against him; that a verdict of guilty was returned against him, and that the court sentenced him to the state reformatory. All the foregoing was given verbally in making the state's original case, against objection for immateriality and because not the best evidence. In addition to this, the state introduced the certified record of a conviction for larceny of certain rye in 1895, and of sentence. Another—perhaps trifling—item of evidence was to the effect that five years before the offense charged defendant had been a medicine peddler.

From the time when advancing civilization began to recognize that the purpose and end of a criminal trial is as much to discharge the innocent accused as to punish the guilty, it has been held that evidence against him should be confined to the very offense charged, and that neither general bad character nor commission of other specific disconnected acts, whether criminal or merely meretricious, could be proved against him. This was predicated on the fundamental principle of justice that the bad man no more than the good ought to be convicted of a crime not committed by him. An exception is indulged where other crimes are so connected with the one charged that their commission directly tends to prove some element of the

latter—usually guilty knowledge, or some specific intent. We mention this exception merely for accuracy, to qualify the generality of the foregoing statement. It obviously can have no application to such remote and disconnected events as those here presented. The cases in which overzealous prosecutors have trespassed upon this rule, so that appellate courts have had occasion to give it reiteration, are almost without number. Many are collected in a note in Wharton, Crim. Ev. (9th ed.) § 30. A few others may be cited: *Regina v. Oddy,* 5 Cox, Cr. C. 210; *Boyd v. U. S.* 142 U. S. 450, 458, 12 Sup. Ct. 292; *Shaffner v. Comm.* 72 Pa. St. 60; *Comm. v. Jackson,* 132 Mass. 16; *Sullivan v. O'Leary,* 146 Mass. 322, 15 N. E. 775; *Lightfoot v. People,* 16 Mich. 507; *Albricht v. State,* 6 Wis. 74; *Schaser v. State,* 36 Wis. 429; *State v. Miller,* 47 Wis. 530, 3 N. W. 31; *Ingalls v. State,* 48 Wis. 647, 654, 4 N. W. 785; *Fossdahl v. State,* 89 Wis. 482, 62 N. W. 185. The foregoing cases are referred to not so much to establish the rule that evidence of such remote acts is irrelevant, and therefore inadmissible, for that must be obvious at a glance. That one stole rye from some one in Minnesota in 1895 has no tendency to prove that he committed this murder in Wisconsin in 1898. They are cited more especially to show how uniformly courts have held that one cannot be deemed to have had fairly tried before a jury the question of his guilt of the offense charged when their minds have been prejudiced by proof of bad character of accused or former misconduct, and thus diverted and perverted from a deliberate and impartial consideration of the question whether the real evidentiary facts fasten guilt upon him beyond reasonable doubt. In a doubtful case even the trained judicial mind can hardly exclude the fact of previous bad character or criminal tendency, and prevent its having effect to swerve such mind toward accepting conclusion of guilt. Much less can it be expected that jurors can escape such effect. In a case of this sort, where it is believed that so horrible a crime has been com-

·mitted, and where naturally and properly there is great anxiety that such outrage do not go without retribution upon the perpetrator, as to whose identity the field of speculation is wide, the tendency to fasten suspicion upon some member of the community whose record is bad is very strong, and fraught with great danger to the unfortunate individual, however innocent.    In such a case a most imperative duty rests upon the court to take every precaution that such facts as we are now considering do not reach the knowledge of the jury.    While it is awful that such a tragedy as this may happen in a civilized community, and the guilty man escape punishment, it is inexpressibly worse that the law itself should add thereto the still more terrible crime of imprisoning for life an innocent person; thus subjecting the community to two crimes, instead of one, and leaving the criminal still unpunished.  Whether such result has been accomplished by the judgment here we cannot know with certainty, but it is at least possible, if the minds of the jury have been subjected to the perverting influence of irrelevant facts and circumstances, which do not logically nor legally tend to establish guilt, but· which may naturally turn suspicion in defendant's direction, and create a prejudice against him, depriving him of that impartiality and anxious regard for his safety, if innocent, which the jury owe him were he the vilest of the vile.

The attorney general seeks, not so much to justify, but rather to palliate, the admission of the testimony as to the criminal proceedings on the ground that the court ruled it admissible as tending' to identify the transaction with that claimed to have been mentioned by the defendant to the district attorney in accounting for his possession of the money he spent in Minneapolis and St. Paul.    It could not be so justified, even if it had such tendency.    The fact of previous guilt or conviction was not a proper one to be proved, and defendant's own admission thereof, standing alone, would not have been admissible.    It could come in only because it was

part of a statement relating to other and relevant facts. *Lightfoot v. People,* 16 Mich. 507; *Coleman v. People,* 55 N. Y. 81, 89. It could not open the door for affirmative and original proof of the forbidden fact. Defendant had a right to go to the jury upon contention of either falsity or inaccuracy of the testimony that he had made such statements; which, by the way, hardly admitted conviction, even as narrated by some of the witnesses to the conversation. Further, however, the extended and graphic narrative of the proceedings in the Minnesota court was not at all necessary to the attempted identification. The only word from the witness who gave it which could have had any relevancy to the case on trial was the statement that only on one occasion was defendant present in the Minnesota court, thus giving significance to the testimony of Johnson, the then prosecuting witness, that defendant declared to him that all money received for the rye in question had been spent. It should be noted, however that no such excuse was even offered for admitting in evidence the certified record of the conviction. That was expressly received by the court to prove the fact that defendant had been convicted of a crime.

We are thus brought irresistibly to the conclusion that palpable and grave error was committed in permitting any of these derogatory facts to be proved against the accused in any way. In addition to this fundamental error, it was also clearly erroneous to allow parol proof of the various court proceedings, of which the best and only proper evidence was the record. *Kirschner v. State,* 9 Wis. 140, 145; *Ingalls v. State,* 48 Wis. 647, 655, 4 N. W. 785. Even for purposes of impeachment, parol proof of a prior conviction can be made only by virtue of statute (sec. 4073, Stats. 1898), and then only by cross-examination. To that extent only has the present statute modified the rule declared in the two cases last cited.

That the errors committed in the admission of these various

items of evidence were well calculated to prejudice the accused cannot be seriously doubted. His right was to have the jury weigh all the suspicious circumstances upon the presumption that he was a man of ordinarily good character and reputation; to dwell upon the consideration that circumstances may be accumulated against any person, and the conclusion of guilt be still in reasonable doubt, for the reason alone that ordinary persons seldom or never commit such atrocities as this. Hardly any consideration could more probably hasten the jury to ignore that doubt than that the accused was not one of ordinary character, but a convicted criminal, familiar with the inside of jails and their debauching effects. When distinct error is committed, courts cannot lightly assume that no prejudice has resulted. Prejudice is the ordinary result of breach of a rule of law, else the rule itself could have no right to exist. To warrant appellate courts in deeming an error innocuous, it is said, "It should appear beyond a doubt that the error complained of did not and could not have prejudiced the rights of the party duly objecting." *Boston & A. R. Co. v. O'Reilly,* 158 U. S. 334, 337, 15 Sup. Ct. 830. Such considerations as just stated constrain us to disagreement with the contention that the error in proving the various derogatory or degrading facts in defendant's history must be deemed nonprejudicial because afterward the defendant took the stand as a witness, and thereby opened the door to proof of a prior conviction by way of impeachment, so that at worst this objectionable evidence was merely received out of order. To this it might well be urged that the order in which facts are brought to the minds of the jury may substantially vary the effect. It is, however, sufficient answer to this argument that the evidence received over objection far exceeded anything which would have been admissible by way of impeachment, even after defendant had testified. Proof of specific acts of crime or misconduct is generally not admissible for impeachment. Roscoe, Cr. Ev.

(11th ed.) pp. 95, 142; *Rex v. Layer,* 16 How. St. Tr. 285;
*Comm. v. O'Brien,* 119 Mass. 342; *Carthaus v. State,* 78
Wis. 560, 47 N. W. 629; *Emery v. State,* 101 Wis. 627, 650,
78 N. W. 145. It is only by virtue of statute that the fact
of previous conviction is an exception to that rule. (See note
to sec. 4073, Stats. 1898; Roscoe, Cr. Ev. p. 95.) That stat-
ute permits no other exception than proof of the fact of con-
viction, and permits that proof only by cross-examination of
the witness himself, or by the record. The trial court per-
mitted proof of various specific facts tending to degrade the
defendant, other than the mere fact of conviction, and per-
mitted that proof to be made by parol evidence from wit-
nesses other than accused. This, as already stated, could not
have been done by way of impeachment; hence the error was
in no wise cured or waived by the fact that defendant took
the stand, and thereby subjected himself to proper impeach-
ing evidence.

3. Error is also assigned because defendant was precluded
from proving the balance of a conversation, part of which the
state had given. The court apparently applied rather strictly
a rule limiting cross-examination to the exact subject of di-
rect examination. The right of a party to call witnesses to
testify further as to a conversation of which part has been
proved by his adversary is not so limited. In general, such
party has a right to give the whole of such conversation, at
least so far as it has relation to the subject-matter of the ac-
tion, and is not confined to that particular part thereof given
by his adversary. Roscoe, Crim. Ev. (11th ed.) p. 51; *Mack
v. State,* 48 Wis. 271, 279, 4 N. W. 449; *Plano Mfg. Co. v.
Frawley,* 68 Wis. 577, 585, 32 N. W. 768; *Fertig v. State,*
100 Wis. 301, 307, 75 N. W. 960; *Frank v. State,* 27 Ala.
37; *Dodson v. State,* 86 Ala. 60, 5 South. 485. The portion
of the conversation drawn out by the state, among other
things, was made a basis for argument that the money which
defendant had in Dakota in the fall of 1898 was the same

stolen at the Seldon house, because he visited his father's house before going west, and might thus have repossessed himself of that money. If, in the same conversation, defendant negatived such inference by explaining where and how he obtained money—as we understand he did—such statements related to the same subject-matter, and served to explain and qualify the portion made use of by the state. We are persuaded that the exclusion of proof of other parts of this conversation was error which might well have prejudiced defendant by withholding from the jury the fact that his whole statement, taken together, rebutted, instead of supported, the inference urged by the prosecution.

4. Error is also assigned upon the claim that the district attorney, in his opening to the jury, before the taking of any evidence, stated as a fact that the accused, on the day before the event, was seen so close to the house, and under such circumstances, as to arouse suspicion of a bad purpose—not upon the traveled highway, but upon the road east of the Seldon house, in the edge of the woods, in company with unknown persons, who immediately disappeared, and went into the woods—of which facts not the slightest shred of evidence appeared throughout the case. Such a statement was undoubtedly calculated to greatly prejudice the accused. It served to keep him in the minds of the jury, marked as a legitimate person for suspicion, while the various facts and circumstances were being brought out in evidence, which otherwise would have had no special application to him. It also supplied to their minds that which was especially lacking in the evidence, namely, the prior contact of the accused with the immediate vicinity, at any rate within many years. If the prosecuting attorney made such a statement without a wellfounded belief that the proof was in his hands, he could not be too strongly reprehended, and the prejudice would be so obvious as to make very cogent ground for the circuit court to deny or set aside conviction. We are loath to believe that he

·could have been guilty of such a breach of professional and ·official ethics; and, while it is somewhat difficult, in view of the absolute absence from the record of any offer to make such proof, to conceive circumstances which should justify it, we must, in justice to the high character of this officer, indulge ·ourselves in the belief that at the time of making the statement he thought he had witnesses to testify to such fact.   We ;shall content ourselves with pointing out the impropriety of the statement in the absence of such well-founded belief, with-·out attempting to decide whether the statement of itself must constitute reversible error, in the absence of any request to the trial court to take action to rebuke the same, and warn the jury against allowing it any effect.

5. Error is alleged upon the introduction of a number of photographs showing the ruins and the surrounding premises. Testimony showed them to be correct representations of the ·scene attempted to be portrayed.   We think they fall within the rule of admissibility as outlined in *Selleck v. Janesville,* 104 Wis. 574, 80 N. W. 944, and that the error is not well as-·signed.

Neither can we persuade ourselves that there is reversible ·error in the admission in evidence of a partially burned block ·of wood taken from the pile of charcoal on which the body ·was found.

Again, the refusal to strike out the testimony of a witness— Gludt—to the effect that he was of the opinion that accused ·was the same person seen by him in Lake City, Minnesota, the evening of June 16th, which is assigned as error, we think should be sustained.   The language of the witness as to reaching a belief of the identity of the two from information ·derived from others might well have been construed as ap-·plying to a conclusion reached by him before seeing the de-·fendant, and is not inconsistent with the view that the testimony to his identity was based upon memory of the person seen at Lake City and observation of the defendant in court.

Of course, the trial court had a better opportunity to judge· on that question, and we cannot disturb his resolution of the uncertainty arising from the testimony.

A large amount of evidence, not necessary to mention in detail, was given with reference to the conduct of defendant during the period of his flight from arrest, covering his conduct, numerous declarations shown not to be true, the use of assumed names, his place of residence, the use of money,. carrying of firearms, and the like. This has been examined. carefully, without impressing upon us that it presents anything of prejudicial error. Conduct of a suspected person after the crime is a legitimate subject for consideration, as bearing upon the probability of his guilt; and it is not easy,. if at all possible, for courts to draw any line segregating. those acts which to some minds may seem significant of guilt from those which are irrelevant because justifying no such inference. We are unable to say that any of those assigned as error necessarily fall within the latter category.

Complaint is made that the state was allowed to introduce in rebuttal proof of a conversation in which the defendant. was said to have stated that he knew a "place where he could get some money, and, if there was anybody in the house, it would be easy to hit him on the head, and nobody would ever find out." Defendant had been asked on cross-examination if he did make such a statement to the witness at the time alleged, and denied it. The evidence is claimed to have been used not merely for purposes of impeachment, but as substantive proof of knowledge of opportunity, and hence of motive. Of course, if it were admissible at all for the latter purpose, it should have been offered by the state in its original case. Offered as it was, its admission was justified merely by the fact that defendant had, on cross-examination, denied the conversation. It was presumptively offered and received only as impeaching him, and the court might well have instructed the jury that they were to consider it only for that

purpose, if so requested. Inasmuch as no such request was made, however, we can discover no specific reversible error in connection with it. The evidence was admissible at the time it was offered.

A former brakeman of the Burlington Railroad was allowed to testify that in 1898 the engines used by that company did not correspond with that described by the defendant as mounted and ridden by him on his alleged trip to Minneapolis on the night of the 15th. The witness had qualified himself by testifying that he knew the only. type of engines which were used by that railroad. Whether this was true or not, it qualified him *prima facie* to state their characteristics, and that they did not have the appliances which defendant had described upon the engine boarded by him.

We find no other assignment of error which seems to require specific consideration in this opinion.

For the reasons above stated, the jury's decision of guilt is inconclusive. They have reached it only by considering facts which the law denies them the right to consider. They have been deprived of facts which the law required they should know and consider. It is, of course, greatly to be regretted that the great labor of this protracted trial should have been rendered futile by these errors therein. No such consideration can, however, bear any comparison in importance to the possibility that an innocent man is now suffering imprisonment at the hands of the government. That he is innocent is presumed in all courts until a conviction has been had without departure from the rules which the law, in its wisdom, has found necessary for the protection of the safety and freedom of the individual.

*By the Court.*—Judgment reversed, and cause remanded for a new trial. The warden of the state prison will deliver the plaintiff in error to the sheriff of Buffalo county, who is directed to keep the said Paulson in his custody until he is duly discharged therefrom, or until otherwise ordered according to law.