BAKER, Plaintiff in error, vs. THE STATE, Defendant in
error.

*November 21—December 11, 1903.*

*Criminal law and practice: Obtaining money under false pretenses:
Charitable purpose: Information: Allegation of knowledge of
falsity: Instructions to jury: Reasonable doubt: "Orphans'
asylum": Material misrepresentations: Evidence: Character of
accused: Prior criminality: Intent to defraud: Similar misrep-
resentations: Remoteness: Husband and wife.*

1. Sec. 4423, Stats. 1898 (providing that "any person who shall
   designedly, by false pretenses or by any privy or false token
   and with intent to defraud, obtain from any other person any
   money, goods, wares, merchandise, or other property," shall
   be punished), prohibits and punishes as well the fraudulent
   obtaining of money or goods for an ostensibly charitable pur-
   pose as for any other. *State v. Crowley,* 41 Wis. 271, limited
   and explained.

2. In such case, an information which, after enumerating the rep-
   resentations claimed to have been made by the accused, al-
   leged that each of such representations was not a fact, "all
   of which the accused then and there well knew," is *held* a
   sufficient allegation of knowledge on the part of the accused
   of the falsity of the statements charged against her.

3. An instruction that "a reasonable doubt which entitles an ac-
   cused person to an acquittal is a doubt of guilt reasonably·
   arising from all the evidence in the case," taken in connec-
   tion with the remainder of the charge, is *held* to have conveyed
   to the jury with sufficient clearness the rule that they must
   acquit unless the evidence overcomes all reasonable doubt, al-
   though the use of the expression "which entitles an accused
   person to an acquittal" is disapproved. It would be better to
   instruct in that regard that the doubt should arise from a con-
   sideration of all the evidence *or want of evidence.*

4. In a criminal prosecution for obtaining money by falsely repre-
   senting that the accused was collecting money for an orphan
   asylum, an instruction to the effect that a boarding house or
   place where children were taken care of for hire, and in which
   no element of charity entered, cannot be considered an "or-
   phans' home" as the term would ordinarily be understood by
   persons who are solicited for charitable donations for the sup-
   port of such an institution, as qualified in other parts of the
   charge, is *held* not to have been erroneous.

5. In such case, an instruction that the jury might reach a verdict of conviction if any of the material representations were found to have been made and to be untrue, with the other necessary qualifications, is *held* not to have been erroneous. The false statements established, however, must have been material in the sense that they of themselves, without aid from those which were not proved, induced the accuser to part with his goods or money.

6. In a criminal prosecution the jury have a right to consider the prior criminality of the accused only as bearing on his credibility where he is a witness on his own behalf, but subject to the exception, however, that in cases where a specific intent is an essential element of the crime (such as the intent to defraud in a prosecution for obtaining money under false pretenses), other similar acts so closely connected with that charged as to tend directly to show the intent characterizing the latter may be proved for that purpose.

7. In a prosecution for obtaining money by falsely representing that the accused was collecting money for the support of an orphan asylum maintained by her, evidence of conversations between the accused and two witnesses, which took place in another state some six months before the offense in question, in which she made statements concerning an orphan asylum quite different in detail from, though having some general similarity to, those made to the prosecuting witness, without a showing that such statements were in any way connected with an intent to obtain money from or defraud those to whom they were made, or that the place then maintained by the accused was the same as the one in existence when the alleged offense was committed, and evidence that the place as described in said conversations was materially different from the place the accused actually maintained, is *held* too remote to be admissible as tending to show fraudulent intent.

8. Evidence more or less derogatory to the accused, descriptive of an establishment maintained by her a year and a half before the offense for which she was on trial, and also of an establishment maintained for several months prior to that offense, both establishments being different from that maintained at the time of the offense, is *held* erroneously admitted.

9. Evidence of transactions with and communications from the husband of the accused, not in her presence, the tendency of which was to show a purpose of himself and the accused to apply to their own private accumulations the money obtained by them from contributions for the orphan asylum and not to devote them to the care of the orphans, is *held* inadmissible.

Baker v. The State, 120 Wis. 135.

10. Testimony of a witness as to the conduct of herself and others who were soliciting aid for the orphanage of the accused, in the absence of and without anything to show the accused's connection therewith, is inadmissible.

11. Evidence derogatory to the accused, such as admissions that she did not dare to collect money due her from her sister because the latter knew facts to her disadvantage and threatened to expose her, evidence of rumor in the community and recollections of the contents of public records in connection with her marriage, are prejudicial and should have been excluded.

ERROR to review a judgment of the circuit court for St. Croix county: E. W. HELMS, Circuit Judge. *Reversed.*

Plaintiff in error was convicted upon an information which alleged that she had feloniously, unlawfully, knowingly, designedly, and with intent to defraud one Alex. Turner, pretended to him that she was a representative and agent of an orphan asylum located at the city of Duluth, known as the "Baker Orphanage;" that Mrs. Phipps was the local representative at Hudson, Wisconsin, of said asylum known as the "Baker Orphanage;" that the same was an institution of the same kind and character as the Dysart Orphanage, located at Ripon, Wisconsin; that it was an institution operated for the care and maintenance of orphaned children, of whom there were then a large number therein being cared for and supported by said asylum; that the management of said orphanage and she (the plaintiff in error) were engaged in finding homes for orphan children, and that she was then collecting money for the support and maintenance of said orphanage, and for the support and maintenance of the orphan children located therein. The information then proceeds to allege that *Mrs. Baker* was not then and there a representative of said orphan asylum, and in that form proceeds to negative the existence of each of the facts alleged to have been represented, closing such negation with the words "all of which she, the said *Mrs. J. S. Baker,* then and there well knew." It also alleges Turner's

belief in the representations, and inducement thereby to give to the plaintiff in error twenty-five cents. To review such conviction, and sentence to pay a fine of $300, and be committed to the county jail until the same be paid, not exceeding five months, the defendant brings this writ of error.

For the plaintiff in error there was a brief by *J. W. Bashford* and *Theo. Buehler,* attorneys, and *Bashford, Aylward & Spensley,* of counsel, and oral argument by *R. M. Bashford.*

For the defendant in error there was a brief by the *Attorney General* and *Walter D. Corrigan,* second assistant attorney general, and oral argument by *Mr. Corrigan.*

DODGE, J.   1. The first assignment of error involves the contention that the statute (sec. 4423, Stats. 1898) punishing the obtaining of money under false pretenses applies only to commercial transactions, and is not applicable to the mere inducing of one to donate money as a charity. This contention has support from *People v. Clough,* 17 Wend. 351, which seems not to have been questioned or expressly reaffirmed on this point in New York. The conclusion was reached in that case on the strength of the recitation which preceded the English statute (30 Geo. II, ch. 24) which was the prototype of most of the statutes in this country; the latter, however, not retaining the preamble. That preamble recited as to the wrong to be reached by the statute the obtaining by evil-disposed persons of divers sums of money or merchandise, "to the great injury of industrious families and to the manifest prejudice of trade and credit." From this the New York court argued that such trifling sums as people were ever induced to give to mendicants or for charity were not likely to cause great injury to industrious families, or to prejudice trade and credit. The English courts, in construing their own statute, have never so limited it. *Reg. v. Hensler,* 11 Cox, Cr. Cas. 570; *Reg. v. Jones,* Temp. & M. 270. Nor has any other court, so far as we, or apparently

the counsel, have ascertained, adopted the view of the New York court, which has been repudiated by many of them. *Comm. v. Whitcomb,* 107 Mass. 486; *State v. Matlhews,* 91 N. C. 635; *Strong v. State,* 86 Ind. 208; *State v. Styner,* 154 Ind. 131, 56 N. E. 98; 2 Wharton, Cr. Law, § 1153; Bishop, Cr. Law, § 467. It is claimed that this court, in *State v. Crowley,* 41 Wis. 271, has expressly declared its adoption of the rule of *People v. Clough,* and it is true that in that case, at page 284, this court said:

"After much investigation and deliberation, we have reached the conclusion that the rule of the New York cases is supported by the better reason, as well as by the weight of authority, and that it is our duty to adopt it."

That, however, was said not with reference to the point in hand. The question in *State v. Crowley* was merely whether the inducing of one to part with his money, where both were participants in a criminal enterprise and purpose, was within the statute, and it was held that the act was not intended to protect criminals in their unlawful dealings with each other; that being a suggestion also made in *People v. Clough,* and being the basis of decision in all the other New York cases cited. Clearly, that was the rule of the New York cases which this court declared its decision to adopt. We do not deem it controlling upon the present question, which we may therefore consider as an open one in this state.

The language of our statute, adopted *verbatim* from Massachusetts (*State v. Green,* 7 Wis. 676, 685), is general:

"Any person who shall designedly, by false pretenses or by any privy or false token and with intent to defraud, obtain from any other person any money, goods, wares, merchandise, or other property," etc.

The magnitude of the money or property so obtained is of no consequence to the existence of the crime. The turpitude of one who defrauds in the name of charity is at least as great as that of one who meets another at arm's length in the

open field of commercial transactions.  Criminal statutes are not so much to protect the individual from injury, as to purge, as far as possible, from the community, the act deemed wrongful and prejudicial.  Nor can we concur with the suggestion of the New York court that parsimony and resistance to calls of charity are so strong and effective generally with our people as to make fraud in solicitation for such purposes of but trifling efficacy or danger.  We are persuaded not only that the great weight of authority, but the true principle underlying this enactment, requires the holding that it prohibits and punishes as well the fraudulent obtaining of money or goods for an ostensibly charitable purpose as for any other, and that in this respect, at least, the information is not insufficient.

2. It is further contended that the information is insufficient for that it does not clearly allege knowledge on the part of the accused of the falsity of the statements charged against her.  The manner of allegation of the falsity of the statements, and of *Mrs. Baker's* knowledge thereof, is set forth in the statement of facts.  Confessedly, it is somewhat inartificial, and not the most approved and unambiguous method of asserting that the statements were false, and that the accused knew they were false, and yet we cannot think it reasonably capable of any other significance.  To declare that an asserted fact is not the fact cannot fail of declaring the falsity of such assertion, and such declaration is made with reference to each of the representations charged upon accused.  The phrase, "all of which she, the said *Mrs. J. S. Baker,* then and there well knew," immediately follows all these negations of fact without break, being separated therefrom merely by a comma.  We cannot doubt that she and her counsel were fully informed that the state charged that the various assertions made by her were untrue, and that she knew that the facts so asserted by her did not exist, and that this is sufficient.

3. Several assignments of error are predicated upon the charge to the jury.

(a) Among these was a somewhat peculiarly worded instruction with reference to the Dysart institution, to which accused was claimed to have represented that her orphanage had resemblance. By the evidence it appeared that there never had been any such thing as the Dysart Orphanage at Ripon. The court informed the jury that there never had been such an institution, and then went on to instruct that accused might be convicted under this information if any material representations among those specified in the information were false. Counsel take diametrically different views of the force of this charge; the plaintiff in error assuming that it was an instruction that this assertion, at any rate, was false, and was enough to convict, while the Attorney General understands it as a declaration that this could not be a material misrepresentation, but that, if there were others established, she might nevertheless be convicted. As it will not be material to the result, we only call attention to the ambiguity of the expressions used, as evinced by the differing positions of counsel thereon, to the end that upon another trial such ambiguity may be avoided.

(b) Strenuous criticism is made upon the instruction with reference to reasonable doubt—especially upon the sentence therein, "A reasonable doubt which entitles an accused person to an acquittal is a doubt of guilt reasonably arising from all the evidence in the case." This is claimed to fall within the criticism recently pronounced in *McAllister v. State,* 112 Wis. 496, 500, 88 N. W. 212, and to suggest the idea that evidence must be adduced in the case which arouses a doubt, before the jury are entitled to acquit. It suffices to say that the whole charge, taken together, of which this sentence is merely a part, so completely negatived that idea, and conveyed the contrary one—that the presumption of innocence pervaded the whole trial, and that acquittal must result un-

less that presumption was overcome beyond all reasonable doubt—that it is in no wise obnoxious to what was said in the *McAllister Case.* The vice in the instruction there criticised consisted in the possible suggestion to the jury that conviction was their duty unless they could find from the evidence justification for acquittal, although that justification might consist in a reasonable doubt raised by the evidence. The instruction in this case, taken in whole, made clear that they must acquit unless the evidence overcame all reasonable doubt. The phrase used in the above-quoted sentence, "which entitles an accused person to acquittal," is not of itself to be approved. It may be claimed that it suggests that obstacles must be affirmatively overcome to warrant acquittal. The substituted phraseology used in *Emery v. State,* 101 Wis. 627, 650, 78 N. W. 145, is much preferable, namely, "beyond which guilt must be affirmatively proved in order to justify a verdict of guilty." That preserves the idea that there exists persistently the burden to prove guilt, never the burden to prove innocence. That the doubt must be one arising from a consideration of the whole evidence is an unassailable proposition. *Emery v. State, supra; Butler v. State,* 102 Wis. 364, 369, 78 N. W. 590. That does not mean, however, that any specific or affirmative proof of innocence need be introduced to arouse the doubt. Absence of evidence on some subject may leave the mind reasonably doubtful of guilt. Hence it is well to inform the jury that the doubt should arise from a consideration of all the evidence, *or want of evidence,* though we are not prepared to hold that the absence of such italicized addition is necessarily reversible error.

(c) Further error is assigned upon the definition in the charge of what might constitute an "Orphanage," or "home for orphans," the court saying:

"If the defendant or her husband were maintaining a boarding house, or a place where children were taken care of for hire, and in which no element of charity entered, then

such institution cannot be considered as an orphans' home, as the term would ordinarily be understood by persons who are solicited for charitable donations for the support of such an institution."

This was qualified in other parts of the charge by statements that it was not inconsistent with the existence of an orphanage that money might be paid for the care and nurture of the inmates, or that the persons in charge thereof should receive their expenses and reasonable compensation and emolument for so doing. The concrete question presented is whether some element of charity is essential to the thing described by the accused, according to the information, as an orphan asylum and as the Baker Orphanage. It is, perhaps, possible that an institution might be maintained solely and entirely for profit, the primary purpose of which was to furnish facilities for the care and nurture of children bereaved of parents, just as a hospital for the care of the sick may be maintained upon that theory, and may prove to be profitable to the proprietors. It is hardly conceivable, however, that the proprietors of such an institution would expect the public to make contributions towards its support if informed of its characteristics. Lexicographers are not unanimous, but lean toward a meaning for "orphanage" or "orphan asylum" suggesting destitution of those relieved, rather than a profit-seeking enterprise: Standard Dict.: "Orphanage. An institution for the care of destitute orphans; orphan asylum." Century Dict.: "Orphanage. An institution or home for orphans; orphan asylum; an asylum or home for destitute orphan children." Webster: "Orphanage. An institution or asylum for the care of orphans." Id.: "Asylum. An institution for the protection or relief of some class of destitute, unfortunate, or afflicted persons." We are persuaded that the definition adopted by the trial court accords with the meaning which the words must have had in the context, and under the circumstances where uttered, according to the in-

formation and the evidence of the complaining witness. It. is not conceivable but the accused must have used them in the sense of suggesting some measure of charity, and with· the expectation that they would be understood in that sense by the hearer. We hold that there was no error in the charge on this subject.

(d) As already stated, the court instructed the jury that. they might reach a verdict of conviction if any of the material representations were found to have been made and to be· untrue, with the other necessary qualifications. No authority is cited in opposition to the correctness of this rule, which. has been entirely approved in this state as to civil cases. (*Shaw v. Gilbert,* 111 Wis. 185, 86 N. W. 188), and is supported in criminal prosecutions by *Rex v. Dale,* 7 Carr. & P. 352, and *State v. Mills,* 17 Me. 211. We see no reason why the rules in civil and criminal cases on this subject should differ, except as to the certainty of proof. Of course, it must appear that the false statements which are established were· material in the sense that they of themselves, without aid from those which are not proved, induced the accuser to part with his money or goods; else the crime of obtaining goods. by false pretenses is not accomplished. We conclude, therefore, that there was no error in this instruction.

4. We now come to the errors assigned upon the admission of evidence, which are very numerous, but not more so· than is warranted by the extraordinary flights of inquiry in which the trial court indulged the state's counsel. Much of the objected testimony consisted of narratives of conversations with and conduct of the accused on other and remote· occasions, so interlarded with gossipy or scandalous suggestion and innuendo as to indicate the purpose of the witnesses, if not of counsel, to degrade and discredit her in the esteem of the jury. Any such attempt on the part of counsel in the· trial of any case, but especially of the attorney for the state in a criminal prosecution, is highly improper, and should be·

promptly checked by the trial court. *Barton v. Bruley,* 119 Wis. 326, 96 N. W. 815. One accused has the right to have his guilt or innocence of the particular charge impartially tried by the jury, unprejudiced by any knowledge of his general bad character. This subject has been so recently treated in *Paulson v. State,* 118 Wis. 89, 94 N. W. 771, and *Barton v. Bruley, supra,* that we may forego further remark upon its general aspects. Notwithstanding this general right to immunity from inquiry into previous character, and absolute right against such inquiry for mere purposes of vilification, still the accused sometimes must be subjected to a disclosure of improper or criminal conduct other than that charged, when such disclosure is the incidental and unavoidable result of proving some essential and material fact relevant to the particular issues on trial—as, for example, conviction of another crime may be proved against an accused if he takes the stand as a witness, but merely to affect his credibility. Further than that the jury have no right to consider his prior criminality as bearing on the probability of his commission of the acts charged, though probably they cannot be prevented from so doing, unconsciously if not consciously. In a class of cases where a specific intent is an essential element of the crime, other similar acts so closely connected with that charged as to tend directly to show the intent characterizing the latter may be proved for that purpose. The crime here charged involves, as an essential element, the intent to defraud, and is among that exceptional class. *Mayer v. People,* 80 N. Y. 364. This exception does not open the door to general vilification, however. It is no more proof of the fraudulent intent than of the other elements of the crime that accused is of loose morals or general dishonest tendencies. Whart. Cr. Ev. § 46; *Comm. v. Shepard,* 1 Allen, 575. Intent, in its legal sense, is quite distinct from motive. It is defined as the purpose to use a particular means to effect a certain result. Motive is the reason which leads the mind

to desire that result. The intent charged here is the purpose to mislead Turner into giving money in reliance on supposed, but not existent, facts, known by the accused not to exist. The law permits the inference that one who commits a series of acts bearing close similarity and connection with each other, and clearly evincing a similar intent in each, probably has the same intent in another act of the same nature as, and clearly connected with, such series. *Comm. v. Stone,* 4 Metc. 43; *Weyman v. People,* 4 Hun, 511, affirmed in 62 N. Y. 623; *People v. Molineux,* 168 N. Y. 264, 297, 61 N. E. 286; *State v. Cole,* 19 Wis. 129; *Williamson v. State,* 74 Wis. 263, 42 N. W. 111; Roscoe, Cr. Ev. (11th Eng. ed.) pp. 93, 491. It is under this rule that the state claims admissibility generally for the testimony now under consideration.

A large part of this protested evidence consisted of testimony of two witnesses to conversations with the accused in Minnesota some six months before the offense in which she made statements as to an orphanage maintained by her quite different in details from those made to Turner, though having some general similarity. There is no showing that these statements were in any way connected with an attempt to obtain money from, or otherwise defraud, those to whom they were uttered. There was no showing that the place then maintained by her was the same as that existing April 1, 1902, and later in the trial the contrary expressly appeared. No relationship whatever is suggested between these conversations in Minnesota and that with Turner, except that in both of them the existence of an orphans' home was mentioned, and some description thereof given. This was followed by evidence that the place maintained by accused in October, 1901, was quite different from the description given to these witnesses. We are unable to discover any semblance of connection between these transactions and that charged, especially with reference to the intent. Whatever the intent in the earlier ones—mere boasting or what—it certainly

could not have been that charged to have existed in the interview in April, 1902. By the admission of this evidence the accused was exhibited to the jury as a liar, and was discredited and abased, as she ought not to have been. We deem it altogether remote and inadmissible.

None of the other evidence presented by the assignments of error is even claimed to come within the exception above discussed, permitting proof of other similar transactions in a trial for false pretenses. We will consider it as briefly as we may.

A considerable body of testimony was given in description of an establishment maintained by accused about the autumn of 1900, known as "Sacred Refuge"—all of it more or less derogatory. We are wholly at loss to account for the offer or admission of this evidence, unless, indeed, the court conceived that an orphanage could not be kept by an unsuitable person, and that bad housekeeping at any time tended to show the keeper unfit to maintain an orphanage. It certainly did not tend to prove that the specific statements made by her as to an entirely different establishment in April, 1902, were false. That was the fact charged against her. Admission of this class of evidence was error.

Another very great mass of evidence was offered from numerous witnesses, but especially from one Mrs. Parker, descriptive of the establishment maintained by the accused and her husband at No. 4544 London Road during the months of December, January, February, and perhaps part of March. A great deal of this testimony was derogatory, showing the place to be very badly kept, to be wholly inadequately furnished, and was permeated throughout by suggestion of ill treatment of the few children who were its inmates. It must have been very injurious to the accused, if not properly admissible. A large part of this testimony was given without its appearing whether the establishment referred to was the same maintained by the accused on the 1st

of April, 1902, the time of alleged misrepresentations to
Turner; but it finally appeared by one of the state's witnesses.
that the accused had removed from 4544 London Road, and
established herself in a different location on the same street,
about the 1st of April, and by another witness that such re-
moval was prior to the 1st of April, and either in March or
late in February.    There is no evidence tending to show
that the last place was either identical with or similar to that
kept during the period covered by this testimony.    The evi-
dence was objected to on the ground, amongst others, of re-
moteness.    We cannot avoid the conclusion that this objec-
tion was well founded.    There is no presumption, especially
upon a criminal trial, that one who in January had an in-
adequate establishment at one place also has, after removal
to another place, an inadequate and unfit establishment.    It
is not alleged in the information that *Mrs. Baker* made any
representations as to what kind of an establishment she main-
tained in January, but merely that at the time of her con-
versation with Turner she had an orphan asylum.    If it be
conceded that evidence of lack of furnishings, small number
of children, charges for their board, inadequate clothing, and
the like, go to prove that the establishment was not an orphan-
age or orphan asylum, within the meaning of those words as
used by the accused to Mr. Turner; still this class of evi-
dence had no tendency to show the falsity of the statements
made by her as to an institution entirely distinct and sep-
arated by a removal and by some period of time from that
which the witnesses saw.    We must hold that the admission
of this class of testimony—especially so much of it as came
in after the fact of the removal to the other place appeared—
was error.

Two or three witnesses were allowed to testify to transac-
tions with and communications from the defendant's hus-
band, not in her presence, the tendency of which was to show
a purpose of himself and wife to apply to their own private

accumulations all moneys obtained by them, and not to devote them to the care of the orphans; also a desire to be secret as to the amounts received. It seems too obvious even to require statement that this was erroneous. If any facts exist within the knowledge of a third person, they must be proved by the testimony of that person, and not as hearsay by those to whom he has made statements; but especially were the statements of the husband inadmissible against the accused, for he could not have been permitted to testify to them. *Carney v. Gleissner,* 58 Wis. 674, 17 N. W. 398.

Some testimony was given by Mrs. Smith as to conduct of herself and others who were soliciting money in Minnesota for this orphanage, in the absence of *Mrs. Baker,* and with which she is not shown to have had any connection. The facts testified to are of very little relevancy, and we might think them nonprejudicial, but the inadmissibility of such evidence is obvious. It is entirely *res inter alios acta.*

Testimony was admitted from different witnesses tending to show circumstances derogatory to the accused—part of it by her own admissions, and part of it by rumors in the community and by recollection of the contents of public records. The more prominent of those subjects were, for example, an admission by *Mrs. Baker* that she did not dare to force her sister to pay over money due her, because that sister knew things to her disadvantage, and threatened to expose her; also that she and her husband, while living together and having a young baby, were rumored in the community not to be married, and that they at first asserted a marriage in Minneapolis, but could not produce certificate, then admitted it to be only a common-law marriage, and then later were formally married, as witness ascertained from a record inspected by him at West Superior. There were other things more or less injurious to the general character of accused and of her husband admitted in evidence, not needing mention in detail. A reference to *Goodwin v. State,* 114 Wis. 318, 90 N. W.

170, *Paulson v. State,* 118 Wis. 89, 94 N. W. 771, and *Barton v. Bruley,* 119 Wis. 326, 96 N. W. 815, must suffice to show not only the error, but the extreme prejudice to the accused from such testimony. There may be doubt whether full exception was reserved to all of these objectionable items of evidence, but enough to constitute reversible error were duly excepted to.

This opinion has already extended to such volume that we feel the very many other assignments of error upon details in the admission of evidence may be passed without express discussion, and left with the expectation that any errors therein will not reappear upon a new trial, conducted in deference to the general suggestions hereinabove contained. Enough errors certainly have already been pointed out to render reversal unavoidable.

*By the Court.*—Judgment and sentence reversed, and cause remanded for a new trial.

# CASES DETERMINED