# STATE v. WILLIAM SCHREIBER.[1]

May 27, 1910.

Nos. 16,543—(24).

**Homicide — conviction sustained by evidence.**

In a prosecution for murder in the first degree, it is *held* that the death of the person charged in the indictment to have been killed was sufficiently established by direct proof, within the meaning of the statutes, and that the evidence justified the jury in finding defendant guilty of the crime.

**Same — newly discovered evidence.**

No errors were committed on the trial, and the court did not abuse its discretion in denying defendant's motion for a new trial, based on the ground of newly discovered evidence.

Defendant was indicted in the district court for St. Louis county for the crime of murder in the first degree. The case was tried before Dibell, J., and a jury which returned a verdict of guilty. Defendant's motion for a new trial was denied. Defendant was sentenced to imprisonment for life. From the judgment entered thereon, defendant appealed. Affirmed.

*Ross & McKnight,* for appellant.

*George T. Simpson,* Attorney General, *John H. Norton,* County Attorney, and *Warren E. Greene,* Assistant County Attorney, for the State.

BROWN, J.

Defendant was convicted of the murder of Frank Massopust, and appealed from an order denying a new trial. The record and assignments of error present for consideration the questions (1) whether the evidence produced by the state was sufficient to justify a conviction; (2) whether the court below erred in overruling de-

[1] Reported in 126 N. W. 536.

[Note] As to proof of corpus delicti, see note to Bines v. State (Ga.) 68 L. R. A. 33.

fendant's objection to the admission of certain evidence; (3) whether the county attorney on the trial was guilty of prejudicial misconduct; and (4) whether the trial court erred in not granting a new trial on the ground of newly discovered evidence. We dispose of the questions in the order stated.

1. As correctly stated by counsel for defendant, it was incumbent upon the state, in order to justify a conviction, first to establish by direct proof the fact that Frank Massopust, the person alleged to have been killed, came to a violent death at the hands of some third person; second, to establish by evidence beyond a reasonable doubt that defendant killed him. A careful consideration of the record, which is very voluminous, fully satisfies us of the sufficiency of the evidence in both respects.

Massopust was a young man of good habits and in good health. He was unmarried, and lived upon a claim some twenty miles from any village or city, when not engaged elsewhere at his trade as a carpenter. He had several neighbors, also residing upon claims; the nearest being defendant. Massopust was prosperous and saved his money, having a considerable sum on deposit in one of the banks in the city of Virginia, St. Louis county. On August 20, 1907, he made a deposit in that bank and received a certificate therefor in the sum of $329.25. On February 4, 1908, he surrendered an old certificate to the bank for $271, receiving in return $60 in money and a new certificate for $211. Following this, he returned to his claim, taking with him these certificates, and, so far as the record shows, the money also, where he remained visiting his neighbors and attending to his affairs until the day of his death, February 9, 1908. Several dancing parties were given by the neighbors, all of which he attended, and appeared in the best of health and spirits. He gave a dance at his own cabin a few days before his death, and defendant was present, with the other people of the neighborhood. He was at home on Sunday, February 9, the day of his death, and was visited in the afternoon by a neighbor named George Carter, who remained at the cabin until about five o'clock in the afternoon. At this time Massopust was jovial and pleasant and presented no signs of discontent or ill health. As Carter left for his home, Mas-

sopust remarked: "When you come back from running the mill, * * * we will have another little dance." This was the last seen of Massopust alive by any person except defendant.

At eight o'clock that evening, two gunshots were heard by some of the neighbors coming from the direction of Massopust's cabin. At about ten o'clock a fire was discovered by Mrs. John Carter, wife of the brother of the witness George Carter, already referred to, and her husband and George Carter immediately started out to learn its whereabouts. They found the Massopust cabin nearly consumed by fire. Massopust not being found about the premises, they proceeded to the neighbors in search of him, to apprise him of the fact that his cabin was on fire. They first called at defendant's residence and inquired whether Massopust was there. Defendant's wife appeared at the door and stated in response to the inquiry that he was not. Defendant himself did not appear at this time. They then proceeded to O'Toole's, another neighbor, advising him of the fire, and the three men then started on the return to the scene, calling again at defendant's, whom they then found at home. He proceeded with them to the fire, which had gained such headway that it was impossible to discover whether Massopust was within the building; and, supposing the fire to have been accidental, and that Massopust had gone to some of the neighbors further away, they returned to their homes, agreeing to meet again the next forenoon.

On the following morning they met at the scene of the fire, and then discovered in the ruins the remains of a human body, so charred and burned as to be wholly unrecognizable. The legs, arms, and head had been entirely consumed. The trunk only remained. The coroner was notified, and on his appearance an investigation was made, and what remained of the body examined, as well as it could be under the circumstances. Upon and across the body, with the muzzle reaching above the shoulders, lay Massopust's gun. At the side of the remains was found his watch, which had stopped at 9:20 o'clock. Near the watch was also found an Odd Fellows' pin, subsequently identified as one owned and worn by Massopust. The body was subsequently turned over to the brother of the deceased and conveyed to New Ulm, his former home, where it was buried.

These facts are uncontradicted, and leave no doubt of the fact that the remains of the human body found in the ruins of the fire were those of Frank Massopust, the person alleged in the indictment to have been killed. This conclusion is confirmed by the further fact that no other person in the neighborhood was missing at the time, no strangers had been about, and since the fatal night Massopust has never been seen. We have no difficulty, on this showing, in affirming the contention of the state that the death of Frank Massopust was shown by direct proof, within the meaning of the law. Com. v. Williams, 171 Mass. 461, 50 N. E. 1035; Buel v. State, 104 Wis. 132; People v. Palmer, 109 N. Y. 110, 16 N. E. 529, 4 Am. St. 423; Paulson v. State, 118 Wis. 89, 94 N. W. 771.

2. Did Massopust come to a violent death at the hands of some third person? That such is the fact seems from the evidence clear. As already noted, he was a young man of good habits, industrious, prosperous, and had accumulated a considerable sum of money, which he had on deposit in the bank, and the evidence furnishes no reasonable basis for concluding that he killed himself. It contains no suggestion that he was weary of life; on the contrary, it fairly appears that he was satisfied and contented.

Defendant offered some evidence on the trial for the purpose of showing his insanity, from which an inference of possible suicide might be drawn; but we find this evidence wholly insufficient to justify such a conclusion. One item of testimony offered for this purpose was to the effect that a day or so following a dancing party Massopust had given his neighbors, a short time before his death, he appeared at the residence of his neighbor O'Toole, and offered to pay Mrs. O'Toole for a cake she had made and furnished him on that occasion. Mrs. O'Toole declined to accept the proffered payment, and it is claimed Massopust felt somewhat disturbed thereby and appeared to the witness as strange and unusual. However, at the request of the O'Tooles, he joined them in a game of cards and remained at their home for several hours. We fail to discover in this incident any evidence of insanity whatever. The other act of Massopust claimed on the motion for a new trial to indicate un-

soundness of mind seems of less significance even, and need not be mentioned.

Aside from the circumstances tending conclusively to negative suicide, there are items of proof strongly supporting the contention of the state that he was shot and killed, and the house set on fire for the purpose of concealing the crime. Of course, in the condition of the body after the fire, this could not be demonstrated to a certainty; but the evidence presently to be mentioned justifies that conclusion.

After the coroner reached the scene he made a cursory examination of the remains, and discovered in the chest of the body a large hole about the size of a man's fist, to which no particular attention was paid at the time; all proceeding on the theory that some accident had befallen Massopust. Subsequently the body was exhumed and a more careful examination made. The hole in the chest was closely examined, and it was found that a piece of the sternum, about an inch in length, was gone, and that the ribs about the hole were broken and partly carried away. This clearly indicated violence from the rear of the body, and that the wound was caused by gunshots fired into the back. However, the back was so charred and burned that it was impossible to discover the entrance of the bullet from that quarter, yet the character of the wound in the chest clearly indicated such to have been the fact. Upon this examination of the body there was also found a blood clot in the left pleural cavity, extending from the third rib to the diaphragm, about three inches in depth and width. The physicians testified that this was formed before death, and that it could have been caused by a violence of the nature just suggested, a gunshot through the body. While it is true that they also testified that the clot might have been formed from other causes, certain diseases, there is no evidence that Massopust was afflicted with any of the ailments mentioned; on the contrary, his good health affirmatively appears. The conclusion that the clot of blood was formed as the result of the gunshot fired into the back of Massopust and passing entirely through the body was, in our opinion, fully justified, and from that and the other facts stated

it sufficiently appears that Massopust came to a violent death at the hands of some person other than himself.

3. We come, then, to the question whether the evidence shows beyond a reasonable doubt defendant's guilt of his murder. We shall enter into no extended discussion of the evidence upon this question, nor attempt to point out all the incriminating facts, or the inferences and conclusions which might legitimately be drawn by the jury from the various circumstances presented by the evidence, but will limit the opinion, in the main, to a general statement of some of the principal facts, from which it is believed a sufficiently clear understanding of the case may be had. The evidence tending to connect defendant with the crime, though entirely circumstantial, points with reasonable, if not unerring, certainty to him as the perpetrator of the deed.

On the evening of the fire, and after the discovery of the same, the Carters went in search of Massopust to inform him of the fact, believing that he was at some of the neighbors. They first called at defendant's residence, and his wife stated that Massopust had not been there that evening. Defendant did not appear. Without informing defendant's wife of the fire, they proceeded to the next neighbor, O'Toole, and aroused him. This witness accompanied the Carters back to the fire, and on their way they again called at defendant's home, and defendant himself promptly answered their knock at the door. This was about twenty minutes after their first call. The witnesses say that a light was then burning on the table in the front room, whereas there was no light when they first called. They also say that when defendant same to the door he "looked as white as a sheet." They then communicated to him the fact that Massopust's cabin was on fire, and their fears that Massopust might be in the burning ruins. At this information, defendant's wife uttered an exclamation of horror, and defendant sternly commanded her to "shut up." Defendant accompanied the others to the scene of the fire; but it had gained such headway that nothing could be seen within the building.

Defendant pointed out, however, to the other parties, what seemed to him the body of Massopust; but the others could see nothing

through the flames to confirm his discovery. It is somewhat significant that the next morning, after the fire was entirely out, the body of Massopust was found precisely at the point indicated by defendant. On the day after the fire, defendant remarked to O'Toole, and perhaps others, that he "was glad he was not the first person to discover the fire; that George Carter was not only the last person to see Massopust alive, but the first to know of the fire." He repeated such statements to O'Toole so often that the latter became out of patience and rebuked him. This circumstance tends strongly to corroborate the theory of the state that defendant's mind and conscience were troubling him, and that he was endeavoring to throw suspicion upon George Carter, for at that time no one save defendant suspected that murder had been committed. All supposed and believed, and so expressed themselves, that some accident had befallen Massopust. Prior to the death of Massopust, defendant was practically without money, and so stated his condition to several of his neighbors. Immediately afterward he had money, and expended it openly. He bought a cow in a day or so, paying $40 in cash. George Carter, on a trip to town, brought him a bill of groceries, and defendant paid him the sum of $16. The Sunday following the murder of Massopust, defendant offered to buy a Bible at the church, and tendered a $20 gold piece in payment.

We digress at this point for the purpose of disposing of the only assignment of error challenging any of the rulings of the court on the trial. A few days before the murder Massopust had received from the bank in Virginia $60 in money and a new certificate of deposit. The state sought to prove in what currency the money was paid to him. The officer of the bank was unable to say, but, over defendant's objection, testified that about ninety per cent. of the money paid out at the bank was in gold and silver. Defendant complains of this evidence as substantially prejudicial. In this we do not concur. We discover no error in the admission of the testimony. It tended to show that Massopust had some gold in his possession at the time he was killed, and that the gold exhibited by defendant in payment of the Bible he sought to buy was taken from the person of Massopust by defendant after he had shot and killed him.

Resuming the narrative from the point of digression, we find that a suspicion of foul play soon spread through the neighborhood, and because of defendant's sudden acquisition of money the suspicions were directed towards him. One of the neighbors, a Mrs. Cantwell, had made some pointed remarks; and defendant went to Duluth and retained the county attorney to prosecute an action against her for slander. This was on the first of April following the murder. Nine days later, on April 9, defendant appeared at Washburn, in the state of Wisconsin, under the name of Frank Massopust, the dead man, and entered into negotiations with parties at that time for the purchase of a tract of land. He passed himself off as Massopust, and produced in payment of the land the consideration of which was $300, one of the certificates of deposit issued and delivered to Massopust in his lifetime by the Virginia bank. He produced the older of the two certificates, the one for $329. This he delivered to the Bayfield County Bank for collection, indorsing on the back thereof the name of Frank Massopust. The bank then advanced him upon the certificate the sum of $75; the agreement being that the balance should be applied toward the land bargained for, the deed for which was to be delivered when the Virginia bank honored the certificate. The certificate was duly transmitted to the issuing bank at Virginia, and the officers thereof, upon inspection, promptly declared the signature of Massopust a forgery and refused payment. Defendant was subsequently arrested, charged with the forgery, and lodged in jail.

The Wisconsin parties, with whom defendant negotiated, were brought over, and positively identified him as the person who had signed Massopust's name on the back of the certificate and had delivered it in part payment for the land he had bargained for. They also declared that defendant had, while in Wisconsin, passed himself off as Frank Massopust, and all dealings were had with him under that name. Upon being confronted by these parties, defendant emphatically denied that he had ever seen either of them before, or that he was in Wisconsin at the time stated, or there or elsewhere had negotiated the Massopust certificate of deposit.

Defendant on the trial attempted to explain away some of the

111 M.—10.

significant and incriminating circumstances, to which we will make brief reference. One of the principal facts tending to connect him with the crime was his possession of the certificates of deposit, his appearance in Wisconsin as Frank Massopust, and the negotiation of the certificate for the purchase of land in Massopust's name. As already stated, when confronted with the Wisconsin parties while he was in jail on the charge of forgery, he emphatically denied all the Wisconsin transactions, and persisted therein until called as a witness on the trial below. He then admitted all the witnesses testified to on this branch of the case—admitted the forgery of the name of Massopust on the certificate of deposit, and the negotiations for the land in his name. He attributed his change of front to the fact that he had experienced religion while in confinement in the county jail. His explanation was that, a short time before the death of Massopust, on the same day, Massopust came to him and delivered the certificates into his hands for safe-keeping. He stated that Massopust expressed fear that he might lose them, or that they would be worn out or injured by being carried about in his pocket, and that, as he was away a considerable portion of the time, he thought best to place them in defendant's charge for safe-keeping.

We find nothing in the record to corroborate this claim. Massopust had not, so far as the record discloses, made defendant a confidential friend. He had carried on his own person one of the certificates of deposit nearly a year before his death, and it is somewhat difficult to understand why he should suddenly become alarmed about the possibility of losing them. Moreover, defendant had the certificates in his possession from the time of the fire until he negotiated the one in Wisconsin, yet he made no mention of the fact to any person. When he met Massopust's brother at O'Toole's residence two days after the fire, he appeared considerably embarrassed, and, with the certificates in his pocket or concealed at his home, remarked to the brother, "Frank Massopust was the best friend I [ever] had, and if he was here he would tell you so." Yet to the brother of this dear friend he made no offer to return the certificates, but kept them secreted, and attempted later to turn them into money. At the time he was arrested on the charge of forgery, which took

place at his home, he directed his wife to burn the second certificate, together with the receipt for the one negotiated at Washburn, Wisconsin, which direction the wife complied with. If defendant had come honestly by the certificates, as he claims, it is clear that he would with equal honesty have surrendered them upon learning of the death of his friend.

But counsel suggest that a sudden impulse came over him to appropriate them to his own use, that an opportunity was presented by which he believed he could obtain the money upon the certificates without discovery, and that the temptation was too strong, and he yielded. We are not impressed with this theory. The jury passed upon it, and, in our view of the whole record, properly rejected it. Defendant's explanation of his conduct in parading himself at Washburn as Massopust and buying land in his name was that he intended to make an investment for the benefit of the estate of the dead man. This does not harmonize with the theory of temptation just mentioned, and, besides, he had no intention of advising the relatives of his purpose; for he stated on the witness stand, in answer to a question as to how he expected the estate to be benefited, that he thought the heirs might some time learn of it and then claim the land. The honesty and good faith of these explanations were for the jury to consider. We find nothing in them to justify the conclusion that the jury did not rightfully declare him guilty of the crime charged, or which, as a matter of law, would create a reasonable doubt of his guilt. The jury rejected the explanations as untrue, and defendant's whole story as unworthy of belief, and we find no justification for interfering with their conclusion.

4. Defendant also assigns as error the refusal of the trial court to grant a new trial on the ground of newly discovered evidence. As remarked by the trial judge in the memorandum attached to the order denying a new trial, there is nothing of substance in the proposed new evidence. In the main, it bears upon the suggested insanity of Massopust, from which it is sought to draw the inference that he might have committed suicide.

The affidavits set out what the affiants state as the unusual and strange appearance and conduct of Massopust a few days before his

death; the most striking or significant act being his offer to pay Mrs. O'Toole for the cake. There were three affidavits upon this subject. Though each of the affiants stated that Massopust on the occasion acted strangely, no inference is to be drawn therefrom, in our opinion, as tending to show insanity or unsoundness of mind. At any rate, it was only cumulative of that offered on the trial, and the court did not abuse its discretion in denying the new trial on that ground. The further showing along this line was an affidavit of statements claimed to have been made by George Carter, a witness for the state, a few days after the crime, which indicated the opinion or impression in the mind of Carter at that time that Massopust had killed himself. But this is not important. It may be conceded that Carter so expressed himself. We gather from the record that foul play was not suspected for some time after the murder, and undoubtedly the neighbors were indulging in speculation on the subject. That one of the state's witnesses may have suspected suicide is not proper evidence that such was the fact.

5. We have considered the assignment of error charging misconduct on the part of the prosecuting attorney, and discover nothing in it for comment. No ground for a new trial was there presented.

6. Defendant was given an eminently fair trial in the court below. His rights were protected by able counsel, who made every legitimate effort to minimize the force of the evidence of the state, and to account for the conduct of defendant on the theory of innocence, rather than guilt, and he has been accorded all the rights guaranteed in such cases by the constitution and laws of the state. Our conclusions are in harmony with those expressed by the learned trial judge, that the defendant's guilt was shown by competent evidence beyond a reasonable doubt, and his conviction must stand.

Order affirmed.