## UNITED FIDELITY LIFE INS. CO. v. ADAIR.

### No. 3119.

Court of Civil Appeals of Texas. Amarillo.
Nov. 21, 1928.

Rehearing Denied Jan. 9, 1929.

Bledsoe, Crenshaw & Dupree, of Lubbock, for appellant.

Bean & Klett, of Lubbock, for appellee.

JACKSON, J.

This suit was instituted in the district court of Lubbock county, Tex., by Mrs. Cassie Adair, the appellee, against the United Fidelity Life Insurance Company, appellant, to recover $4,500, interest and penalty, on an insurance policy issued November 20, 1925, by appellant, to appellee's husband, Eugene T. Adair, who died March 7, 1926. Recovery of reasonable attorney's fees, alleged to, be the sum of $1,500, was also sought.

The appellant answered by general demurrer, general denial, admitted the execution and delivery of the policy, but pleaded that Eugene T. Adair died by self-destruction within less than a year after the issuance and delivery of the policy, which contained this provision:

"If the insured, whether sane or insane, shall die by self destruction within one year from the date hereof or before the second annual premium becomes due, the amount payable hereunder shall be the amount of premiums actually paid under this policy."

In response to special issues submitted by the court, the jury found that Eugene T. Adair did not intentionally kill himself, and that appellee was entitled to recover $1,000 as attorney's fees. •

On this verdict the court rendered judgment in favor of appellee for $6,580, with interest from the date of the judgment at the rate of 6 per cent. per annum; from which judgment this appeal is prosecuted.

The appellant challenges as error the failure of the trial court to direct a verdict in its behalf because the undisputed testimony shows that Eugene T. Adair, appellee's husband, intentionally killed himself by shooting himself with a pistol, and thereby committed suicide, within less than one year after the issuance of the policy sued upon. Appellant tendered the amount of the premium that had been paid, $68.99, to the appellee.

The testimony discloses that Eugene T. Adair, the deceased husband of appellee, had been for several years engaged as an automobile dealer in Lubbock, Tex. That in· the operation of his business he sold automobiles and frequently took notes for. a part of the consideration, secured by mortgages against such automobiles. That the notes and mortgages so taken were disposed of to the Commercial Credit Company of New Orleans, the First Mortgage Investment Company of Dallas, and other finance companies. That for some months prior to his death, the deceased had been giving duplicate and sometimes triplicate mortgages on automobiles which he had for sale. That he would sell the different mortgages on the same car to different finance companies. That he would usually sell a car to one of his employees, who would execute notes and a mortgage on the car, and said notes and mortgage be disposed of to some finance company; and when a bona fide purchaser was found for the car, notes and a mortgage of the bona fide purchaser would be

taken and said notes also negotiated to some finance company. That these duplications had been discovered, and representatives of some of the finance companies had interviewed deceased and warned him that such a practice would likely get him into the penitentiary. That to one of the finance companies to whom he was indebted $13,000 or $14,000, he admitted that he had been doing wrong and asked that he be indulged a reasonable time in order to straighten up the duplications. That at the time he paid $3,000 and a few days later an additional $3,000. That the parties to whom he was indebted were pressing him for their money. That on Wednesday preceding his death, he, in company with his partner, made a trip in an automobile to El Paso, Tex., to secure money with which to discharge the obligations that were pressing. That he returned from El Paso to Lubbock about 4 o'clock on the following Sunday morning. That before leaving for the trip to El Paso he borrowed from Paul Harty, a motor cop on the police force of the city of Lubbock, a 45 Smith & Wesson double-action, Army model, automatic six-shooter, which he took with him on his trip to El Paso, advising the officer that he expected to be driving strange roads at night and desired to borrow the gun for that reason. That while he was on this trip, F. L. Hargin made a complaint against the deceased, charging him with the offense of swindling, based on the duplicate notes and mortgages that had been hypothecated.

That at the time he reached home Sunday morning, he was tired from his all-night drive, and his wife asked him if he did not want to take a warm bath. He said he would, took the suitcase which he had carried with him on his trip into the bathroom, set it down, decided he was too tired to bathe, and went to bed and to sleep. That something like an hour thereafter a deputy sheriff of Lubbock county, Vernice Ford, in company with Mr. Settle, went to the deceased's home with a warrant for his arrest.

Mr. Ford, the deputy, testified that Mr. Settle was not an officer, but had stayed all night with him and accompanied him to the home of deceased. That Mr. Settle had no gun, but when they arrived at the house, the deputy advised Settle to go to the back door, as the deceased might run out. That the deputy went and knocked, and Mrs. Adair came to the front door. He asked her to see her husband, was told that he had just gotten in, and asked to wait until later in the day. The deputy declined to do this, was invited in, and accompanied to the back room by Mrs. Adair, to where Mr. Adair was in bed. The officer told Mr. Adair he had a warrant for his arrest. Adair got up, went to the front room, read the warrant, and began dressing and talking to the officer. Adair completed dressing in the living room, putting on his hat and overcoat, and asked permission to kiss

his wife and children good-bye and was allowed to do so.

While Adair was gone to kiss his wife and children good-bye, the deputy was sitting in the front room. After Adair kissed the children and told them to be good, the deputy heard a sound in the neighborhood of the bathroom, as though a glass was taken off of a shelf and the water turned on just a little. That he then heard a click like the glass was set down, and in a second he heard the report of a gun, apparently in that part of the house. That he went through the dining room, kitchen, and hall to the bathroom, the door of which was almost closed. That he pushed it back and saw Adair, who was lying in the bathroom, resting on his right arm and elbow. That the officer found a 45-caliber six-shooter, the barrel of which was warm and smoking, close to Adair's right hand. That Adair made no answer to the exclamation of the officer, "My God, what have you done?" The officer got a pillow, put it under Adair's head, and straightened him out. The odor of gunpowder could be detected in the bathroom at that time. The six-shooter found had one chamber discharged and the other five loaded with lead bullets. The officer called a doctor, the sheriff, and undertaker, all of whom came in a few minutes. The bathroom was approximately 6½ feet by 7 feet, the lavatory on the north, the bathtub on the east, the commode on the south, and the door was to the north of the center of the west side of the room, with the shutter hinged on the north. That there were two windows in the bathroom, one on the east side and one on the south, practically over the commode.

"It was several minutes later before I made any examination of the window and window shade. At the time I made my examination the window shade was still down. There was a bullet hole through the window shade. I examined the bullet hole to try and determine the range of the bullet. The bullet went through the window and shade practically on a level. There was also a hole through the window screen and the window also. The shattered glass was located between the window pane and the screen, on the outside of the window. The fabric of the curtain extended towards the outside. I made an examination of the screen to determine how the wires of the screen were bent. The wires in the screen were bent outward. I wouldn't say how long it was after I went back there to where Mr. Adair was that I made this examination of the window pane and screen, but it was several minutes afterwards."

That there were little blood stains on the inside of the window curtain near the bullet hole. That the deputy was more or less familiar with the use of guns, and a pistol could be accidentally discharged while unloading it or by dropping it on some object or striking the hammer against some object or by pulling the trigger. That all manner of accidents

happen with firearms; men kill themselves accidentally with firearms; that men sometimes carry guns with the hammer on the shell; that a man standing up and examining a gun could accidentally drop it, grab for it, and the gun hit some object and be discharged and in that way shoot himself in the body. That Adair did not resist arrest and did not refuse to go with the officer. That the bullet hole was through the window situated on the south side of the bathroom. That the gun was a double-action gun.

Mr. Settle, who stood outside, testified substantially as did the witness Ford, but heard only portions of the conversation between Mr. Ford and Mr. Adair, heard Adair tell his wife good-bye, but did not hear him tell his children good-bye; saw Adair enter the bathroom, turn north to get a drink of water, heard the water running in the lavatory, saw Adair push the bathroom door partly closed to get to the water; after he heard the water running, Adair turned around and pulled down the window shade on the south side of the bathroom, and in a very few seconds thereafter witness heard the report of a gun, the noise of the glass shattered by the shot, and as quickly as he could the witness went to the front door and on into the bath. He saw no one outside of the building and he himself was unarmed.

The physician testified that when he arrived the body of Adair was warm; that his examination showed that the bullet entered the front, passed through the overcoat, dress coat, and the body, and went out to the left of the spinal column, with the point of exit possibly a little higher than the point of entrance, but practically on a level. That there was an ashy deposit on the coat around the bullet hole that you got with white powder; that there were blood specks on the inside of the window shade; that the hole in the window shade, the glass, and the screen showed the bullet to have gone practically on a level. That "the wound was larger at the point of entrance than at the point of exit. That is the customary condition that we find." That the bullet pierced the body of the heart between the base and its apex. That a bullet was sometimes deflected from its course in passing through the body.

Mr. Higgins, the brother of appellee, testified that he was occupying the adjoining apartment and went immediately, without dressing, to the bathroom where the deceased was when he heard the screams of Mrs. Adair and the children. That he saw Mr. Adair's body, the bullet hole through his overcoat, coat, and vest, but saw nothing that resembled a burn about the clothing. That he rubbed the fiber of the overcoat around where the bullet entered, and it did not show to have been scorched or burned. That he saw the hole in the window shade, glass, and screen; there was some glass on the bath-room floor and some on the window facing; the wires in the screen were bent both toward the outside and the inside. That Mr. Adair was approximately 6 feet 3 inches in height. That he was very devoted to his wife and children.

Mrs. Adair, the appellee, testified that she was at home when her husband died; that Mr. Adair had told her that his business was getting in bad shape; that he got back home from El Paso about 4 o'clock Sunday morning, having wired her from El Paso about the time he would get home; that he arrived very tired, took the grip he had with him on his trip, and went to the bathroom to take a warm bath, but decided he was too tired and went to bed and went to sleep. About an hour after her husband came home, the deputy sheriff came; he refused to wait until later in the day, and she took him to the bedroom where Mr. Adair was, at the time sitting up in bed. That the deputy started to read the warrant, but her husband asked him not to do so; that he would go into the front room. That they went into the front room, and Mr. Adair told the officer he would go with him. That her husband dressed in the living room. That she went to the bedroom, and Mr. Adair asked if he could speak to her before he left, telling the officer he would be back in a minute. That he came back and told her not to worry, that he was going with the officer, and as soon as the Western Union office opened he would wire his brother in South Carolina for financial assistance, take care of the debts that were pressing, and everything would be all right. That his brother in South Carolina was able to help him financially. That he told her good-bye as he always did when he left the house any time of day. That he had put on his hat and overcoat before he left the living room; had his hat on when he told her good-bye; that she did not remember that he went into the bathroom, but realized that he had; that she was under the impression that the toilet flushed; that she heard the report of the gun immediately afterwards; that she was under the impression that the report of the gun came from outside of the house; that she did not see her husband while on the floor; she ran and called for her brother, Mr. Higgins, who, with his family occupied the adjoining apartment, and he came immediately. That Mr. Adair never indicated to her that he was going to do anything rash. She knew his plans and knew definitely what his intentions were, and they did not include anything like killing himself. That he kept a pistol around the home a great deal, but was very careful never to leave it around where the children could get it. That she did not know where he had the gun, as she never saw it at any time and he never spoke to her about it. That the hole in the window shade had one or two slits

two or two and one-half inches long, the glass was shattered, and a good deal of it on the inside on the bathroom floor. The hole in the glass was about an inch in ·diameter, the glass was cracked, flaked off on the inside, and the hole in the screen was about three-fourths of an inch in diameter.

The record discloses that the pistol found by the deputy in the bathroom was the pistol borrowed by Adair from the motorcycle cop; that it was not the ordinary type of automatic pistol and was adapted to the use only of lead bullets, but could be loaded with a clip which carried only steel or copper bullets; that the gun was called an automatic because of the rapidity with which it could be reloaded.

Some of the witnesses estimated that the bullet hole through the window was about four feet above the floor and about the right height to have been made by the bullet passing through the body of Adair while he was standing up. The testimony tends to show that the screen was about three or four inches from the glass and the shade two or three inches from the glass. The witnesses varied in their estimate of the size of the hole in the shade, the glass, and the screen of the window. The record tends to show that the bathroom had in it a commode, lavatory, bath tub, and the grip which the deceased had with him on his trip to El Paso. The evidence does not disclose whether there was any medicine cabinet, towel rack, or other furniture in the bathroom, unless the testimony of Mr. Ford that he heard a sound as if the glass had been taken from a shelf is of sufficient probative force to show that there was a shelf in the bathroom; and the testimony fails to show that he awakened the children to tell them good-bye.

The testimony as to how Adair got shot is entirely circumstantial.

"The judgment must stand, unless the evidence establishes that the shooting was intentional to that degree of conclusiveness which precludes a reasonable doubt to the contrary." Grand Fraternity v. Melton, 102 Tex. 399, 117 S. W. 788, 789.

■ The defense relied on by appellant in this case is suicide or self-destruction and is an affirmative one, and the burden of proof is on appellant to show that the deceased intentionally took his life. Cooley's Briefs on Insurance, vol. 6, page 5460, and authorities cited.

■ "When the circumstances of death are such that it might have resulted from negligence, accident or suicide, the presumption is against death by suicide." Cooley's Briefs on Insurance, vol. 6, page 5454, and authorities cited.

■ "When the facts and circumstances appear, the presumption against suicide, as a presumption of law, disappears, but as a presumption of fact it is and must be ever-present with all reasonable men whose duty it is to pass on the ultimate fact of suicide or accident, where the evidence is all circumstantial." And it is proper "For the jury to consider in reaching their verdict, that the love of life is the strongest instinct of a human being." Parker v. Ætna Life Insurance Co., 289 Mo. 42, 232 S. W. 708, 716.

"Can it be said that no other inference can be drawn from the evidence than that the insured fired the pistol with suicidal intent, or that it precludes a reasonable doubt to the contrary? We think not. It is true that the evidence might be said to be conclusive that the pistol could only be fired by pulling the trigger; but this in our opinion is not sufficient to completely overcome either the presumption against self-destruction or the presumption of accident. It is well settled that, in the absence of satisfactory evidence as to the death being accidental or suicidal, the presumption is in favor of death by accident." Mutual Life Insurance Co. v. Ford, 61 Tex. Civ. App. 412, 130 S. W. 769, 777; Id., 103 Tex. 522, 131 S. W. 406.

The appellant in this case introduced in evidence testimony tending very strongly to show a motive on the part of deceased to commit suicide, but no intent to do so is shown.

■ "Intent, in its legal sense, is quite distinct from motive. It is defined as the purpose to use a particular means to effect a certain result. Motive is the reason which leads the mind to desire that result." Baker v. State, 120 Wis. 135, 97 N. W. 566, 570. See also People ex rel. Hegeman v. Corrigan, 195 N. Y. 1, 87 N. E. 792.

■ There is no testimony in the record tending to show that the deceased, preceding his death, was morbid, morose, melancholy, or despondent, but, on the contrary, tends to show that notwithstanding his financial embarrassment and his apprehension of criminal prosecution, he was actively endeavoring to secure funds with which to satisfy the creditors he had defrauded and protect himself against criminal prosecution. He failed to secure funds on his trip to El Paso, but when the officer came and he was arrested, he agreed to go with him without objection, dressing completely, even putting on his hat and overcoat and then advised his wife, less than two minutes before he was killed, not to worry, that he would be back in a little while; as soon as the Western Union telegraph office opened he would wire his brother for money with which to meet his pressing obligations. The evidence is uncontroverted that his brother was able to assist him financially. In determining whether or not evidence is sufficient to warrant a ver-

944

dict of the jury, appellate courts consider only evidence sustaining the verdict, Fort Worth Mutual Benefit Association v. Jennings (Tex. Civ. App.) 283 S. W. 910; Buchanan v. Davis (Tex. Civ. App.) 300 S. W. 985, and the testimony tends to show a lack of intention to commit suicide.

"After a most painstaking review and consideration of the evidence, we are unable to agree with appellant. It has with marked discrimination and ingenuity woven a most persuasive web of circumstantial evidence, and therefrom deduced a most plausible conception of how the double tragedy was enacted, but at most and best it is but a theory, something which, when applied to past events, can never be demonstrated, a creature of the mind. Likewise, and with no differences except, perhaps, in degree of probability, the appellees have from the same body of testimony erected their own structure of speculation upon how it occurred; and, in our opinion, the state of the entire evidence was such as to make it legitimately susceptible of the application of either theory, according to the individual viewpoint." Georgia Casualty Co. v. Shaw (Tex. Civ. App.) 197 S. W. 316, 317. See also International Travelers' Association v. Bettis (Tex. Civ. App.) 3 S. W.(2d) 478.

The possession of the pistol by the deceased is explained. It is uncontroverted that the deceased was careful never to leave a gun around the place where his children could get it. If, as he bade his children good-bye, he thought of the pistol, he knew it would be a violation of the law to carry it with him, and he may have decided to unload the gun and leave it, but carry the cartridges with him so as to make sure that if his fifteen year old son got hold of the gun, he could not shoot himself or any one else with it.

█ In our opinion, the court was not authorized to peremptorily instruct the jury to find in favor of appellant, because the circumstantial evidence does not exclude every reasonable hypothesis other than that the deceased intentionally took his own life.

The judgment is affirmed.