COMBINED AMERICAN INSURANCE CO., Appellant,

v.

Ruby Lee BLANTON, Appellee.

No. 15845.

Court of Civil Appeals of Texas.
Dallas.

May 26, 1961.

Rehearing Denied June 23, 1961.

Brundidge, Fountain, Elliott & Bateman, and Roger A. Hansen, Dallas, for appellant.

Allen Clark and Harold F. Curtis, Jr., Greenville, for appellee.

WILLIAMS, Justice.

Ruby Lee Blanton, a widow, brought suit in the trial court against Combined American Insurance Company to recover the face value of a policy of insurance insuring the life of her husband, Jasper O. Blanton, who died on August 8, 1958 as a result of a shotgun wound. The policy of insurance in question insured Jasper O. Blanton against loss of life caused by bodily injuries effected exclusively of all other causes by accidental means. Defendant Insurance Company did not deny that the policy was in effect at the time of Blanton's death but did contend that insured committed suicide. Trial was had before the court, without a jury, and judgment was rendered for the plaintiff.

Appellant complains of the judgment of the trial court in five points of error. Points one, two and three, grouped together, contend (1) that there is no evidence to support the trial court's finding that Blanton's death was effected exclusively of all other causes by accidental means; (2) that such finding was against the great and overwhelming weight of the evidence; and (3) that the trial court erred in finding that defendant's evidence did not overcome the presumption of accidental death. These points necessitate a careful review and consideration of the evidence surrounding the death of Jasper O. Blanton.

Ruby Lee Blanton testified that she and Jasper O. Blanton were married in 1930 and that as a result of such marriage three children were born; that for a period of approximately 19 years prior to his death on August 8, 1958 her husband had been manager for the Martin Lumber Company at Commerce, Texas; that for several years she had also been employed by the same company as saleslady. She said that the relationship between her husband and R. C. Martin, the owner of the company, was pleasant. Blanton's salary was $400 per month, and her salary was $35 per week. She and her husband owned their home in Commerce which cost approximately $19,-000, exclusive of furnishing, upon which there was a loan at time of Blanton's death with an unpaid balance of approximately $8,000. She and her husband also owned a ½ interest in a 25-acre tract of land upon which was located a recreation cabin and lake. They also owned a 4.5-acre tract. There was no indebtedness on this property. The family also owned three automobiles. She stated that there were no financial difficulties within the family within 2 or 3 years prior to his death. Mr. Blanton was

active in civic affairs in Commerce, being president of the Boosters Club, past president of the Kiwanis Club, and secretary-treasurer of the Commerce Industrial Association of Commerce, Texas, and also a member and director of the Chamber of Commerce. Prior to his cessation of employment with the Martin Lumber Company her husband had made plans to purchase a lumber business for himself and had, to that end, negotiated for financial assistance to enter business on his own. Further, her husband encouraged their oldest son in his studies anticipating that he would assist him in the new business enterprise. On or about August 5, 1958 both she and her husband were summarily discharged by R. C. Martin; that she did not know the cause of such discharge. Following the date of discharge her husband stayed at home most of the time and had very little to say. On the morning of August 8, 1958 Blanton left the home around 7:30 in the morning to talk with a Mr. Turner concerning his new business enterprise, saying that he would be back in a little while, and that is the last time she saw him alive. He ate a normal breakfast on that occasion; there had been no arguments or quarrels of any nature; and she noticed nothing unusual about his attitude. When asked about her husband's attitude with regard to whether or not he was dispondent, pessimistic towards the future, she said:

"Well, of course we had been planning and talking about buying this lumber company, and I think, of course, he was hurt or might say let-down by this sudden being fired down at the Martin Lumber Company, but he was, we had talked and we had planned on buying this business and running it for ourselves, and I really think that's what, the plans he had in store, because he was encouraging Charles to take all the business math in college, and it was his plans for them to run it together."

She said Blanton spent quite a bit of time at the recreation cabin on the lake cleaning away trash and underbush, shooting snakes, and working around the dam of the pool. Ordinarily he kept three guns at the cabin, a shotgun, a rifle, and a pistol. On the 8th day of August, 1958 the pistol was at the residence. Her husband not returning at the ordinary time, she reported his absence to her son Charles, and she later learned that Blanton's body had been found at the cabin. He had died as a result of a gunshot wound.

Charles Blanton, age twenty, son of Jasper O. Blanton, testified that he was attending college at Commerce, Texas, at the East Texas State College; that he was attending on an athletic scholarship and also worked at odd jobs during the summer. On the day of his father's death he said that he did not notice anything out of the ordinary with his father, that he was ordinarily quiet; that both his father and mother were normal during the days between their discharge from the Lumber Company and his father's death. On August 8, 1958 his mother told him that his father had been gone for sometime, but did not send him to look for his father; that he drove by the lake cabin at approximately sunset. Finding his father's car parked outside the cabin he attempted to go into the front and found the screen door locked and went around to the back and entered the back door alone. The shades were drawn and he could not see well; he saw his father's hat lying on the table and his glasses were lying on the table also. He saw his father's feet on the bed or cot and thought he was asleep and tried to wake him up and found that he was dead. His father's body was lying on his back, his left arm across his chest, and his right arm lying to the side of his body with part of his hand off the cot. His father's head was turned slightly to the left and he observed a small hole in the temple of the right side and when he turned his head over he found that the entire left side of his face was gone. A 410-gauge shotgun was lying on the floor beside his body, the muzzle pointed towards the body. The gun was "perpendicular" on the floor as related to the body on the cot. The muzzle

of the gun was about 8 inches from the edge of the bed. He immediately went next door to a neighbor's cabin and told them that his father was dead and asked them to come and help. On cross-examination he said that the gun would have to be pretty close to his father's head to have left a hole as small as it was on the one side with the shot-pattern on the other side. He said his father usually wore glasses, but not all of the time; that when he was loading his gun or shooting snakes or fishing that he usually did not wear glasses. He was asked as to whether he was concerned about his father when he went to the cabin that evening and his answer was that he wasn't worried about his father because "my father was a sensible man."

B. D. Margraves, Chief of Police, testified that in August 1958 he was Justice of the Peace and was called to investigate the death of Blanton; that he went to the lake cabin and found Blanton's body lying on a cot; that he was dead, lying on his back with his left arm over his body his right arm hanging off the cot. He saw a 410-gauge shotgun about 3 feet from the cot with the muzzle pointing towards the cot. He estimated the muzzle of the gun was about 3 feet from the edge of the cot and the gun was at an angle to the cot. There was a small hole, about the size of a nickel or a quarter on the right side of his head and the left side of his head was completely torn off. Blanton's hat and glasses were on the table. He found no evidence of a struggle in the room nor was there any gun cleaning materials in the general area of the cot. His verdict with respect to the death of Blanton was suicide. On cross-examination he admitted that he had very little training to equip him for the job as coroner, and had only had one other case of suicide.

R. C. Martin testified that he discharged Mr. Blanton and his wife on August 5, 1958 for the reason that it became evident that Blanton was taking funds out of the business for himself. He testified further concerning a transaction concerning the sale of materials for a house; that a building and loan company had financed the transaction to the extent of $9,000 and that such check in the sum of $9,000 had been issued to the borrower and J. O. Blanton in settlement of the account. Martin testified he confronted Blanton with the fact that the lumber company had not received the proceeds of this check and told Blanton he wanted the $9,000. He said that Blanton told him he did not have the money right then, whereupon Martin told him he would give him until the following Saturday to get the money. He testified further that while Blanton was usually a little more nervous than the average person that he did become extremely nervous on the occasion testified about.

■ It is to be observed that the evidence as to exactly how Blanton was shot is entirely circumstantial. The trial court, as the trier of facts, was entitled to consider circumstantial evidence, as well as direct evidence, in arriving at a solution of this problem. There are no findings of fact and conclusions of law, and none were requested by appellant. Where no findings of fact and conclusions of law are requested of or filed by the trial court, the judgment implies all necessary fact findings in support of the judgment. In seeking to determine whether there is any evidence to support the judgment and the implied findings of fact incident thereto it is proper to consider only that evidence most favorable to the issue and to disregard entirely that which is opposed to it or contradictory to its nature. Renfro Drug Co., v. Lewis, 149 Tex. 507, 235 S.W.2d 609, 23 A.L.R.2d 1114; Austin v. Cochran, Tex.Com.App., 2 S.W. 2d 831; Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696.

It is undisputed that Blanton died as a result of the gunshot wound. The only disputed question is whether the gunshot which killed him was accidental or an act of intentional self-destruction. Mrs. Blanton's testimony, together with that of her son, when coupled with the presumption

based upon the recognized instinct of self-preservation is sufficient to rebut any claim of suicide unless the evidence of the defendant shows the shooting was intentional. The judgment must stand, unless the evidence establishes that the shooting was intentional to that degree of conclusiveness which precludes a reasonable doubt to the contrary. United Fidelity Life Ins. Co. v. Adair, Tex.Civ.App., 29 S.W.2d 940, affirmed Tex.Com.App., 29 S.W.2d 944.

█ Appellant admits that it is well settled that there is a strong presumption in the law against suicide. Blanton's death is to be assumed to be due to an accident rather than to an intentional act and it is further to be assumed that Blanton was normal and without suicidal intent. Southland Life Ins. Co. v. Brown, Tex.Civ.App., 121 S.W. 2d 653; Brockman v. J. Weingarten, Inc., Tex.Civ.App., 115 S.W.2d 753, affirmed 134 Tex. 451, 135 S.W.2d 698; 39 Tex.Jur. 853; Great Southern Life Ins. Co. v. Watson, Tex.Civ.App., 343 S.W.2d 921, n. r. e.

The principal case controlling the disposition of this appeal is United Fidelity Life Ins. Co. v. Adair, supra, which involved facts somewhat similar, though apparently stronger on the theory of suicide, as the case under consideration. In that case deceased was an automobile dealer and the testimony revealed that for some months prior to his death he had been giving double and even triple mortgages on automobiles and this had been discovered. He made a trip to raise money and during his absence charges of swindling had been filed against him. Upon his return late at night he was confronted with this and placed under arrest. Absenting himself to prepare for jail he went to the bathroom and was next seen on the floor with a bullet wound through the chest. A jury verdict for the plaintiff was affirmed by both the Court of Civil Appeals and the Commission of Appeals. The Court of Civil Appeals said, significantly:

"The appellant in this case introduced in evidence testimony tending

very strongly to show a motive on the part of deceased to commit suicide, but no intent to do so is shown. 'Intent, in its legal sense, is quite distinct from motive. It is defined as the purpose to use a particular means to effect a certain result. Motive is the reason which leads the mind to desire that result.' Baker v. State, 120 Wis. 135, 97 N.W. 566, 570. See also People ex rel. Hageman v. Corrigan, 195 N.Y. 1, 87 N.E. 792. * * * In determining whether or not evidence is sufficient to warrant a verdict of the jury, appellate courts consider only evidence sustaining the verdict, Fort Worth Mutual Benefit Association of Texas v. Jennings, (Tex.Civ.App.) 283 S.W. 910; Buchanan v. Davis, (Tex. Civ.App.) 300 S.W. 985, and the testimony tends to show a lack of intention to commit suicide. After a most painstaking review and consideration of the evidence, we are unable to agree with appellant. It has with marked discrimination and ingenuity woven a most persuasive web of circumstantial evidence, and therefrom deduced a most plausible conception of how the double tragedy was enacted, but at most and best it is but a theory, something which, when applied to past events, can never be demonstrated, a creature of the mind. Likewise, and with no differences except, perhaps, in degree of probability, the appellees have from the same body of testimony erected their own structure of speculation upon how it occurred; and, in our opinion, the state of the entire evidence was such as to make it legitimately susceptible of the application of either theory, according to the individual viewpoint." [29 S.W.2d 943.]

The Commission of Appeals, in an opinion by Justice Critz, affirmed this judgment, saying:

"It is true that the facts and circumstances of this record lead us to a very strong belief that Adair committed

willful self-destruction, but we cannot render a case on strong belief." [29 S.W.2d 948.]

The question arises as to the degree and amount of testimony which is encumbent upon the defendant to introduce to destroy the presumption of law against suicide. In Texas Life Ins. Co. v. Jordan, Tex.Civ. App., 253 S.W.2d 906, 908, err. ref., the court said:

"Where circumstances of an insured's death are unknown, or in the absence of *satisfactory evidence* as to whether the death of a person is accidental or suicidal, there arises a presumption against suicide and the burden of proving the defense of suicide is on the insurer. (Citing cases)" (Emphasis supplied).

Judge Bowman, as sole judge of the credibility of the witness and the weight to be given to the testimony, both direct and circumstantial, impliedly found that the insurance company had failed to produce satisfactory evidence to rebut the presumption that Blanton was felo de se. In this finding he was supported by evidence of strong direct and circumstantial nature. Appellant's evidence created a doubt and suspicion which the trier of facts was justified in rejecting. It is our opinion that appellant's "no evidence" point must be overruled. Also we deny the contention that the trial court erred in holding impliedly that the insurer had failed to overcome the presumption against suicide.

Next, we consider the question of whether the trial court's judgment is against the great weight and preponderance of the evidence. In determining this question we must review all of the evidence presented, and we have carefully done so. When all of the evidence is reviewed we cannot say that the testimony overcomes the presumption against suicide, nor that such evidence makes the trial court's judg-

ment so contrary to the overwhelming weight of all of the evidence as to be clearly wrong or manifestly unjust. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660; Great Southern Life Ins. Co. v. Watson, Tex.Civ.App., 343 S.W.2d 921, writ ref. n. r. e.

As stated above this unusual case presents many facets, many of which must be determined by circumstantial evidence. Any number of inferences might logically be drawn concerning the death of Jasper O. Blanton. Appellant has not overcome the presumption against suicide by merely emphasizing another inference. Where the facts are so much in doubt as here, proof introduced by the appellant must be of such a strong character as to overcome the other inferences and presumption and point clearly to suicide. As stated by Justice Critz in the Adair case, supra, the facts and circumstances of this record may lead to a strong belief that Blanton committed suicide but we are not in a position to render a case on strong belief. The evidence in this case, where so many alternatives would have been available to the deceased other than suicide, simply does not overcome the well-known presumption against suicide, and therefore leaves a presumption that Jasper O. Blanton died as a result of an accident unassailed. Appellant's first three points of error are therefore overruled.

By its fourth and fifth points of error appellant complains of the action of the trial court in refusing to admit certain testimony. We have carefully examined the record in this regard, and we find no merit in either contention. However, should we be mistaken in this we are of the opinion that the court's action in refusing the testimony under the circumstances constitutes harmless error and could not have resulted in an improper judgment. Rule 434, Texas Rules of Civil Procedure. Appellant's fourth and fifth points are overruled.

The judgment of the trial court is affirmed.