The **NATIONAL LIFE AND ACCIDENT INSURANCE COMPANY, Appellant,**

v.

Beverly J. **KNAPP, a widow, Appellee.**

No. 87.

Court of Civil Appeals of Texas.

Houston (14th Dist.).

April 24, 1968.

Rehearing Denied May 22, 1968.

Tom C. Primm, Patterson, McDaniel, Moore & Browder, Houston, for appellant.

Lloyd M. Lunsford, South Houston, for appellee.

SAM D. JOHNSON, Justice.

This suit was brought by the appellee, Beverly J. Knapp, against the appellant, National Life and Accident Insurance Company for accidental death benefits provided by a supplemental agreement to a policy of life insurance on her deceased husband, William M. Knapp. The basic policy of life insurance provided coverage in the sum of $3,000.00 which was paid. Attached to the policy was a supplemental agreement, providing $5,000.00 additional insurance if William M. Knapp's death resulted from bodily injuries effected "through external, violent and accidental means."

The supplemental agreement provides for additional coverage "Upon receipt * * * of due proof that * * * the death of the insured resulted from bodily injuries,

as herein defined * * *." The agreement then defines the bodily injuries. "As used in this agreement, 'bodily injuries' shall mean injuries which are effected directly and independently of all other causes through external, violent and accidental means, as evidenced by a visible contusion or wound on the exterior of the body * *." The supplemental agreement then proceeds to enumerate certain exclusions from coverage. Reliance by the appellant is placed on only one of the exclusions, it providing, "No payment shall be made under this agreement if the death of the insured * * (5) resulted from the intentional act of another during an altercation in which the Insured participated otherwise than as a spectator * * *."

William M. Knapp's death occurred during the early morning of February 25, 1965 at about 12:30 a. m. He was struck and killed by a bullet from a 30.06 rifle discharged by Gerald T. Hartwell as he was trying to gain entry through the front door of Hartwell's home. The house in which Hartwell lived was in the same block and was the second house from that of Knapp.

On this particular evening, Hartwell was at home with his wife and three-year old child who were asleep. Hartwell was watching television when he heard what sounded like a knock on the door. As he got up to answer, the knocking increased considerably in intensity. By the time he reached the door, the knocking had increased to a pounding. Hartwell asked who was there and received the reply, "It didn't make any difference, he just wanted in." Other requests for identification obtained similar answers, including profanity. Hartwell could not see through the solid door so he went to the double windows just to the left and attempted to see who was outside. The angle was too great between the windows and the door and he could not see who was pounding on the door. Hartwell testified that the person at the door began wriggling the door knob and began kicking and beating on the door, continuing to demand that he be admitted.

As this continued, Hartwell got his 30.06 deer rifle from his bedroom and went back into the living room where the front door was located. Hartwell then fired one shot from the rifle into the door facing three or four inches below the upper left-hand corner. As the beating and kicking on the door continued, Hartwell fired a second shot through the approximate center of the door, about waist high. Following the second shot, Hartwell heard a moan from outside the door and the beating and kicking on the door terminated. Shortly after this, William M. Knapp was found dead on the front porch of the Hartwell house and it was determined that he was killed as a result of a gunshot wound.

Prior to the occurrence described, Knapp had been in the company of Henry E. Dressler and Joseph Roy Mouton. Dressler was a bartender at Buck's Bar where, he testified, he had served Knapp one bottle of beer. Mouton was a motion picture operator who customarily drove his car by Buck's Bar after work and picked up Dressler and drove him home. On this particular night Knapp had asked for a ride to his house which was located in the same general area where they were going. After Mouton arrived at Buck's Bar he waited in his car. Knapp went to Mouton's car and they sat and waited until Dressler closed the bar and came out and got in with them. The three of them then proceeded to drive home together shortly after midnight on a particularly cold night. Both Dressler and Mouton were generally familiar with the area but depended on Knapp to direct them to his particular home. Driving to the block where Knapp lived, they stopped at one house which had a gas light in front, whereupon Knapp stated that they had passed his house. Mouton, the driver, then backed up a number of houses until Knapp said, "This is it," and stopped again. Knapp got out of the car and as Mouton and Dressler drove away, was proceeding toward this second house.

All of the homes in the block were somewhat similar. Only two of the houses,

those of Knapp and Hartwell, had gas lights and only one house separated them. In addition to the gas lights there appear to be substantial similarities between the Knapp and Hartwell residences. Though Knapp's wife and two daughters had lived there for approximately two years, Knapp, a merchant seaman, was away from home for a substantial part of the time. Knapp and Hartwell had never seen or met each other.

The plaintiff's case was presented on the theory that Knapp mistook the Hartwell residence for his own and everything that followed was predicated upon his mistaken assumption and belief that he was at his own home. Arriving at what he thought was his house, he attempted to gain admittance as he normally would. Hearing a strange man's voice inside of what he thought was his home, he intensified his efforts to gain admittance thinking of his wife and two minor daughters inside.

In response to special issues propounded by the trial court, the jury found that Knapp's death was a result of accidental means, that the death of Knapp was not the result of the intentional act of Hartwell, and that Hartwell and Knapp were not involved in an altercation on the date and time in question.

By numerous points of error, appellant presents two fundamental contentions. First, that Knapp's death did not occur as a result of "accidental means." Second, that Knapp's death was a result of an "intentional act" on the part of Hartwell.

■ We first consider appellant's contention that Knapp's death did not occur as a result of "accidental means." To be entitled to the benefits of the supplementary agreement the burden of pleading and proving its applicability was upon the claimant. Combined American Ins. Co. v. Blanton, 163 Tex. 225, 353 S.W.2d 847, rev'd on other grds., Tex.Civ.App., 348 S.W.2d 85; Tix v. Employers Casualty Co., Tex.Civ.App., 368 S.W.2d 105, no writ hist.; Gipson v. Aetna Ins. Co., Tex.Civ.App., 373 S.W.

2d 311, no writ hist. It was here stipulated by the parties that William M. Knapp died as a result of a gunshot wound in his abdomen, obviously an "external and violent" bodily injury. The inquiry must then focus on whether or not the jury's finding that Knapp's death was the result of "accidental means" is sufficiently supported by the evidence.

■ The test of whether death is accidental, within the terms of the policy supplement is a fact question to be determined by the jury and is to be determined from the viewpoint of the insured and not from the viewpoint of the one that does the killing. Releford v. Reserve Life Ins. Co., 154 Tex. 228, 276 S.W.2d 517; Hutcherson v. Sovereign Camp, W.O.W., 112 Tex. 551, 251 S.W. 491; Life & Casualty Ins. Co. of Tennessee v. Martinez, Tex.Civ.App., 299 S.W.2d 181, no writ hist.; Spencer v. Southland Life Ins. Co., Tex.Civ.App., 340 S.W.2d 335, err. ref.

■ Here, as previously stated, the jury affirmatively found that Knapp's death occurred as a result of "accidental means." The word "means" as employed in the term "accidental means" is synonymous with "cause." Bryant v. Continental Casualty Co., 107 Tex. 582, 182 S.W. 673. From the time of this definition, the courts of this state have had numerous instances in which "accidental means" has been given interpretation. A partial and interesting summarization appears in the dissent of Justice Calvert in Pan American Life Ins. Co. v. Andrews, 161 Tex. 391, 340 S.W.2d 787 (1960).

■ In Hanna v. Rio Grande Nat. Life Ins. Co., Tex.Civ.App., 181 S.W.2d 908, err. ref., the courts states, "Where the effect is not the natural and probable consequence of the means which produce it— an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of the means, or an effect which the actor did not intend to produce, and which he cannot be charged with a design of producing—it is produced by accidental means." What were the "means" that

produced the bodily injuries resulting in death of the insured in the case at bar? The record shows that the insured and Hartwell, though they lived in close proximity, were unknown to each other. Their homes were similar. Others had mistaken these homes both before and after the event in question. Both had the only gas lights in the block, it was late at night and no other plausible reason for Knapp's being at the Hartwell home was suggested. The insured identified Hartwell's house as his own saying, "This is it." The jury was obviously persuaded to the plaintiff's theory, that of mistaken identity of the houses by Knapp. Within a matter of a few short minutes this was the "means" that produced the bodily injuries resulting in Knapp's death. This was the initiating action or the cause of what immediately followed. This was not an effect which ordinarily follows or could be reasonably anticipated. The insured had no deliberate intention to go to the wrong home; he could not have anticipated the result that follows. It could hardly be said that the "effect" here obtained was the natural and probable consequence of this "means."

A great deal has been written about the distinction between the words "accident" or "accidental result" and the words "accidental means." The courts have usually stated that under "accident" and "accidental result" fall those instances where an unexpected result arises from an intended or voluntary act, but to fall within "accidental means" it is necessary that the acts or means must themselves be accidental. Applemen, Insurance Law & Practice, Sec. 391. The distinction, certainly the clear distinction, no longer seems to be drawn in this state. Pan American Life Ins. Co. v. Andrews, supra.

In International Travelers' Ass'n v. Francis, 119 Tex. 1, 23 S.W.2d 282, death of the insured resulted from an infection following the extraction of a tooth. It was held to be caused "solely and exclusively by external, violent and accidental means." The court stated, " * * * That the

infection resulting in the death of Mr. Francis was not the natural and probable consequence of the extraction of his tooth, was an effect which does not ordinarily follow and could not have been reasonably anticipated, was not the result of design, and was unexpected, is plainly shown from the uncontradicted evidence. This clearly makes the death an accidental one. Joyce on Insurance (2d Ed.), vol. 5, §§ 2863, 2853a. In order, however, for the recovery on the policy to be affirmed, we must conclude that the death was produced by accidental means. We have concluded that it was so produced. * * * " The court then stated, "* * * Since the extraction of the tooth was the means which brought about the accidental infection, the extraction of the tooth itself becomes the accidental means of infection. * * * "

The Francis case, supra, is generally regarded as committing this jurisdiction to what is called "the more liberal rule." As in the Francis case, the "means" in the case at bar was not the natural and probable consequence of the initial act, was not designed, was unexpected, was not calculated to occasion death, and was produced by a combination of unusual and fortuitous circumstances. The bodily injuries resulting in death were caused by "accidental means."

Appellant places reliance on three cases: In Spencer v. Southland Life Ins. Co., supra, a police officer followed the insured after a speeding incident and approached peaceably, only demanding that the insured enter a police car. The insured threatened him with a shotgun, which he knew to be unloaded and refused the officer's demand that he put it down. The insured was shot and killed by the officer. The court held that the insured's death was not an "accidental death" within the accident policy. Texas Prudential Ins. Co. v. Turner, Tex.Civ.App., 127 S.W.2d 563 (1939), writ dismd., was an instance where the death of the insured occurred as a result of shooting by another on whom the insured had made an unprovoked assault. The insured was warned that he would be shot if he

continued to advance, and, continuing to do so, was shot. The insured was a knowing aggressor and was attacking when he himself was killed. Perry v. Aetna Life Ins. Co. of Connecticut, Tex.Civ.App., 380 S.W.2d 868, err. ref., n. r. e., was a situation wherein the insured broke down two doors and forced his way into a house where his wife was standing with a gun in her hand. The wife then warned that she would shoot and fired one warning shot at the insured who continued to advance upon her. The insured was then fatally shot by his wife. Holding that the insured should have anticipated that in all reasonable probability he would be killed, the court determined that the death did not result from accidental means.

In each of the cited cases, the insured was the knowing aggressor and could be said to have reasonably anticipated the results if the aggression continued. None present instances of a mistake precipitating the entire transaction and resulting in death, as we have in the case at bar.

We conclude that there is ample support in the record for the jury's conclusion that the bodily injuries resulting in the death were occasioned by "accidental means."

Appellant's second contention involves the "intentional act" provision of the policy supplement. The "intentional act" inquiry is separate and quite distinctly set apart from the "accidental means" question.

The policy supplement contains enumerated "Exclusions from Coverage" and appellant's contention is predicated on the following language found therein, "No payment shall be made under this agreement if the death of the insured * * * (5) resulted from the intentional act of another during an altercation in which the Insured participated otherwise than as a spectator * * *."

Such an exclusion is clearly valid and binding. "A provision which limits or destroys the insurer's liability when the death or injury of the insured is the result of his intentional act or of any other person is valid and binding upon the insured and his beneficiary." Couch on Insurance, 2d Ed., Vol. 10, Sec. 41.664, p. 532. "Policies frequently provide in words or substance that no recovery shall be had where death or injury is caused by the intentional act of the insured or any other person. Such provisions are valid and binding, and effect will be given to them." American Jurisprudence, Vol. 29A, Insurance, Sec. 1194, p. 338.

The intention contemplated by such policy exclusion referring to an "intentional act" of another person refers to the intention of the person inflicting the injury. "* * * consequently, where the insured is killed by the intentional act of another, the act is within the exception or limitation, although such act may, as to the insured, have been entirely accidental in that he did not provoke or anticipate the injury." American Jurisprudence, Vol. 29A, Insurance, Sec. 1196. See also 45 C.J.S. Insurance § 772, p. 801. "In considering the question of intention, it is of no consequence that the intention of the actor and that of the insured did not concur in the making of the assault. It is quite sufficient that the injuries were intended by the aggression." Appleman on Insurance, Sec. 485, Vol. 1A, p. 235. We are, therefore, here concerned with the intent of Hartwell, the actor who fired the shot that resulted in Knapp's death.

In Johnson v. Travelers' Ins. Co., 15 Tex.Civ.App. 314, 39 S.W. 972, writ. ref., the policy provision exempted the insurance company from liability for death resulting from intentional injuries inflicted by the insured or any other person. In the trial court it was determined that the injuries and the killing of the insured were not brought about by any fault on the part of the insured and that he did not provoke the difficulty. The sole question was stated to be, "* * * whether or not the policy sued upon covers a case of death arising from intentional injuries inflicted upon the insured by another per-

son, not procured or provoked by the insured." The appellate court affirmed, denying recovery to the insured and said, "It is clear that the insurance company exempted from its risk cases of death arising from injuries intentionally inflicted by the insured upon himself, and injuries intentionally inflicted upon the insured by any other person. It would do violence to well-established rules of construction to interpret the language of the policy to mean that the words 'intentionally inflicted' refer alone to the intention on the part of the insured." This rule was cited with approval in National Life & Accident Ins. Co. v. DeLopez, Tex.Civ.App., 207 S.W. 160.

 Here it was Hartwell's testimony that he did not intend to kill. He testified that he did intend, however, to fire the gun, to do whatever was necessary to protect himself and his family, to "just shoot him in the leg or just scare him away" and to do whatever he had to do to keep him out of his house. Here Hartwell used what was undoubtedly a deadly weapon, fired it in the immediate area of where he knew the other individual to be and fired it at a height where it would be calculated to be fatal if the bullet struck the other person. The result was the natural, probable and foreseeable result of the means employed and it cannot be said that Hartwell did not intend the results that followed. "One must be presumed to intend the natural consequences of his or her acts." Norris v. Stoneham, Tex.Civ. App., 46 S.W.2d 363, 366. The insurer is not required to show that the actor had the specific intention to inflict the particular character of injury that flowed from the act. Travelers' Protective Ass'n of America v. Weil, 40 Tex.Civ.App. 629, 91 S.W. 886, writ ref.; Fidelity & Casualty Co. of New York v. Smith, 31 Tex.Civ. App. 111, 71 S.W. 391. See also National Life Ins. Co. of United States v. Coughlin, 72 Colo. 440, 212 P. 486, and Ryan v. Continental Cas. Co., 94 Neb. 35, 142 N.W. 288, 48 L.R.A.,N.S., 524.

In Walters v. Great Nat. Life Ins. Co., 132 Tex. 454, 124 S.W.2d 850, 853, reference is made to "* * * the settled rule that provisions of accident policies excluding liability in cases of injuries intentionally inflicted are inapplicable where the insured is injured or killed by one who mistakes him for another." See also 8 A.L.R. 322. Here the intent of Hartwell, the actor, was not a mistaken intent. It was directed at the person who was kicking and pounding on the outside of his door, demanding admittance in the middle of the night. Though Hartwell did not then know the identity of that individual, his intent was directed solely at him, whoever he might be.

 "Altercation" was defined by the court as a "warm contention in words, a dispute carried on with heat or anger, a controversy, wrangle or wordy contest." We believe there cannot be no doubt that there was an altercation between the parties in the case at bar. The fact that Knapp may have been mistaken or laboring under a misapprehension does not prohibit there being an altercation. This was Knapp's mistake, not Hartwell's. Knapp's mistake was unilateral, not mutual. During the pounding and kicking on the door, the wriggling of the door knob, the use of profanity accompanied by the demands for admittance, both Hartwell and his wife repeatedly tried to get the person on the other side of the door to identify himself. Hartwell told him to go on and leave them alone. Hartwell told the insured that he was not coming in his house and even fired a warning shot into the upper left-hand corner of his door. Hartwell feared for himself and his family. At this point this was certainly a violent dispute and difference. Hartwell was laboring under no mistake of fact or intent. There was the strongest emotional reaction, heat and anger. There was even more than a controversy, a wrangle or a wordy contest.

In Quaker City Life Ins. Co. v. Sutson, 102 Ga.App. 53, 115 S.E.2d 699, the Georgia Court of Appeals had before it an accident

policy excluding coverage if death resulted from an "altercation." A reference to this case appears in 86 A.L.R.2d 443, 465, wherein it is stated, " * * * so that taking the language of the insured spoken to the third party, and considering her words both profane and abusive, there appeared to be no possible conclusion other than there was not only an altercation, but a heated altercation, in which the insured was the most active participant until such time as she sustained two gunshot wounds by one of the other parties to the wrangle, this clearly being an altercation."

It must be borne in mind that the "intentional act" provision of the policy must be viewed from the point of view of the actor Hartwell. From his point of view Knapp was clearly the aggressor. There can be no other conclusion but that there was an altercation.

For the reasons stated we are compelled to conclude that there is no support in the record for the findings of the jury and that this cause must be reversed and rendered.

Reversed and rendered.